MORRIS SWARTZ v. STATE OF NEBRASKA.

FILED JUNE 13, 1929. No. 26827.

C. E. Walsh and Henry G. Meyer, for plaintiff in error.

C. A. Sorensen, Attorney General, and Irvin A. Stalmaster, contra.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

GOSS, C. J.

Morris Swartz was convicted of murder in the first degree while attempting to rob Roy L. Tinkham, the victim. The jury fixed the death penalty. Judgment was entered sentencing the defendant to death. Defendant brings the case here on error proceedings.

Plaintiff in error sets out many assignments of error. Some are argued but others are not. Such as appear to

be relied, on or seem of sufficient importance to be discussed will be treated of as we proceed.

Misconduct of one of the prosecutors is urged in this, that in his address to the jury he said: "I declare Morris Swartz guilty of murder in the first degree and I will prove it to you, men of the jury, by Swartz' own attorneys. Let us see what they think of the innocence of Morris Swartz. At the opening of this case they offered to plead him guilty to second degree murder and to take life imprisonment in the state penitentiary but this offer was refused by the court. That is what his attorneys think of his innocence."

The trial began on October 1, 1928, and was concluded on the 4th day of that month. The bill of exceptions does not show that the final arguments were reported or that any objection was made during such argument. Indeed, it shows that one of the counsel for the defendant, by affidavit sworn to by him on November 2, 1928, and filed on that day, first brought this alleged language of the prosecutor to the notice of the court in its entirety. He had, however, on October 18, 1928, sworn to an affidavit, which the bill of exceptions shows was filed October 24, 1928, in which he attributed to the prosecutor this language in the final argument: "Gentlemen of the jury, let us see just how innocent the defendant Swartz is. Let us see how innocent his own attorneys think he is. At the opening of this trial they (meaning the attorneys for Swartz) offered to plead him guilty to second degree murder and to take life imprisonment. That's what they think of his innocence." On the hearing of the motion for a new trial, the bill of exceptions shows the prosecutor expressly denied that at any time during the argument he made the statement either in tenor or effect that "I declare the defendant guilty of murder in the first degree."

Had he made such a statement to the jury as to his belief in defendant's guilt, it would have been very reprehensible and prejudicial. That he made it has doubt cast upon it by the failure of defendant's attorney to include it in the first affidavit made on the subject. However, de-

fendant is concluded by the finding of the court overruling the motion for a new trial. The trial judge heard the arguments made to the jury and passed on this issue of fact presented on the motion for a new trial. The bill of exceptions shows that after the beginning of the trial, at least after Mrs. Tinkham, the first witness, was sworn, the very counsel who made the affidavits from which we have quoted, apparently in the hearing of the jury, made this record: "If the court please, I would like to offer this motion: 'Comes now the defendant and enters his offer of the defendant, Morris Swartz, to plead guilty to second degree murder and to accept a sentence of life imprisonment, and requests that the said plea and offer to plead be accepted and that he be given a life sentence under such plea.' " This motion was overruled by the court and the examination of the witness proceeded. It would thus seem as if the other words of the prosecutor (than those alleged as an expression of his belief) were based upon matters which the jury had heard in the trial. If there was anything prejudicial in the comment thereon, counsel for the defendant should have made objection at the time of the argument. Such action would have given the court an opportunity to pass upon the question and, even if erroneous but not prejudicial, to counteract its effect upon the jury. To hold otherwise, in the circumstances, would allow the defendant to sit quiet and speculate on a favorable verdict from the jury and, on failure of that, to demand a new trial before another jury. Ordinarily, unless the fundamental rights of a defendant on trial in a criminal action are violated by the misconduct of a prosecutor in his language to the jury, the defendant must make timely objection thereto so that the trial judge may have an opportunity to rule thereon in the presence of the jury and to correct whatever prejudice might otherwise result. *Catron v. State,* 52 Neb. 389; *Reed v. State,* 66 Neb. 184; *Clark v. State,* 79 Neb. 482.

Plaintiff in error complains because the court refused an instruction requested by him to the effect that the jury

might find the defendant guilty of murder in the second degree, or of manslaughter, and because the court refused another instruction relating to proof of premeditated malice before the jury could find the defendant guilty of first degree murder. These instructions were not applicable to the information under which the defendant was prosecuted. The information was laid under section 9544, Comp. St. 1922, and charged the defendant with homicide in the perpetration of a robbery. The same section provides, also, for ordinary first degree murder based on "deliberate and premeditated malice," in many instances of which offense it may be proper to submit second degree murder and manslaughter, but the offense with which the defendant was charged is another, comprehended in the same section but set off by the alternative "or." As we said in *Pumphrey v. State,* 84 Neb. 636: "Homicide committed in the perpetration of a robbery is murder in the first degree, and in such a case the turpitude of the act supplies the element of deliberate and premeditated malice."

Plaintiff in error in his brief makes rather casual references to section 9544 as "unconstitutional," but does not point out any legal reasons for the unconstitutionality. As no particular ground therefor is pointed out or obtrudes upon our consciousness, we do not find it necessary to pass on that question in this opinion.

In the last paragraph of their brief, counsel for plaintiff in error say:

"Personally the writers believe that society and the man himself would be better served and protected were this court to commute the sentence of defendant to life imprisonment, and so defendant respectfully moves the court for the reasons above set forth for an order commuting the sentence of defendant Morris Swartz from death to life imprisonment, or to grant him a new trial, as this court in its judgment deems best."

Roy L. Tinkham, the owner of a drug store on the northeast corner of Thirty-third and Cumings streets, in Omaha,

was killed therein on Sunday, August 19, 1928, shortly after 4 o'clock in the afternoon. The defendant and Dave Smith, who was jointly informed against but was not tried with defendant, drove, in a stolen car, one block north of the store and parked the car on the east side of Thirty-third street just north of Lincoln Boulevard. They left the engine running and walked back to the store. Entering, they saw Russell Salisbury, the clerk, who was behind the cigar counter, and Lee Foster, a 17 year old clerk and soda boy, who was standing near the door. This door is at the southwest corner of the store. No customers were present. Smith entered first and asked for a well-known drink and the boy went behind the soda counter on the east side and began to prepare to serve it. Defendant entered just behind Smith. Simultaneously Smith covered Foster and defendant covered Salisbury with revolvers and ordered them to the back of the store. The two pairs went beyond a partition, one pair on the east side and the other through an opening on the west. As the bandits reached the back part of the store behind the partition, they discovered Mr. Tinkham sitting at his desk near the northwest corner of the prescription room, reading, with his feet on the desk. One said: "Stick 'em up." Mr. Tinkham turned around, jumped up, reached for his gun that he kept in a case on his desk, and Swartz shot in his direction two or three times. One of the shots hit Mr. Tinkham and as a result thereof he soon died, without speaking. Defendant and Smith went out the front door and the clerks went down a stairway into the basement, their departure hastened by shots in their direction. Foster went out on Thirty-third street on his way to a so-called "pillbox" to get the officers and was shot at by defendant who was going north to the parked car. The police department maintains a place for two motorcycle officers in Bemis Park at a point just west of Thirty-third street on the north side of Cuming street. The officers had heard shots in the store and were ready for action. They overtook defendant and Smith at the car and took them into custody after one of

the officers shot Swartz, inflicting a superficial wound, as Swartz had his gun pointed at the officer. On examination it was found that the defendant had discharged all the shells in his revolver. The evidence shows beyond a reasonable doubt that Swartz and Smith went to the Tinkham store with the intent to secure drugs by robbery, and that Swartz fired the shot that killed Mr. Tinkham.

Upon the trial evidence was introduced by and on behalf of the defendant tending to prove that the condition of mind of the defendant was such at the time of the commission of the act that he was not of sufficient mental capacity to understand the difference between right and wrong as to the particular act charged and to know that the act was wrong. Upon this point the jury were appropriately instructed that the burden was therefore upon the state to prove the defendant's mental capacity beyond a reasonable doubt.

Defendant's plea for a commutation of his sentence, which we have quoted from his brief, is based on the power of judicial clemency conferred on this court by section 10186, Comp. St. 1922.

There is no doubt in our minds, after reading the entire record, that the defendant had long been a slave to the use of heroin, cocaine, and morphine. Much of the evidence produced before the jury was his own testimony on the subject. But he was so fully corroborated as to his habit by his physical condition that the fact seems clear to laymen as well as to experts.

Substantially this is his history, sketched from the hypothetical question put by the prosecutor to the state's expert, but based on the evidence. Born in July, 1898, in Paris, France, premature by two months, of a tubercular mother, who died shortly after his birth; within six months his father brought him to Philadelphia and within a year placed him in the care of his grandparents, remarried and has had nothing to do with him since; at a tender age he fell out of a second story window, injuring his head, but leaving no marks; his grandparents reminded him he was not wanted; at the age of seven he broke a leg, at eight some

ribs were crushed, and at nine a horse kicked and injured him; at eleven or twelve he ran away and went to North Carolina, remaining some months; returned to Philadelphia to his grandparents for a time, thence to New York for a year, thence to California for a year, thence to Philadelphia; when about eighteen years old he went to New York, where he worked and started to use drugs; used drugs for a period of about eight months before he knew he was an addict; thence he went to California, where he remained for a time, using drugs, begging money to procure them; in 1917 he went to Chicago and remained for a time in a tuberculosis sanitarium; attempted to enlist in our army but was rejected; went to Baltimore and signed up in the British Merchant Marine and remained in that service until a month before the armistice was signed; during his service he was on sick leave twice; after that service he was arrested in New York for having narcotic drugs in his possession and was confined four months (for a cure) before trial and then was convicted and detained for an additional time; from there his whereabouts became somewhat uncertain until the early part of 1927, when he was in California and in jail at various times for the possession of drugs; some time in 1927 he left California and went to Butte, Montana, thence to Sioux City, and traveled from there to different places until in August, 1928, when he met Dave Smith in Chicago; about August 5 he and Smith left Chicago, having in their possession an ounce of morphine and an ounce of cocaine, and went to Kansas City, Missouri; before they left Kansas City the morphine supply was exhausted and the cocaine supply almost exhausted; they left Kansas City August 15, 1928, going to St. Joseph, Missouri, and from there to Hamburg, Iowa; they obtained no more drugs until they arrived at Hamburg, where two grains of morphine were obtained and divided between the defendant and Smith; from Hamburg, Iowa, they went to Omaha on a freight train, arriving at Gibson, a suburb, Saturday, August 18, early in the morning; on the 18th of August they were unable to procure drugs in Omaha except a small

quantity of cocaine in solution and searched over town that day in an effort to procure drugs and found none; they obtained a room in the lower part of Omaha, where they spent the night; Swartz was very much in need of the drug and was raving and doing the various other things indicating his need; Sunday morning, August 19, they went out in search of drugs, taking a car which did not belong to them and which was driven by Smith to Gibson and into a pole, where the car was abandoned; they started back uptown and on the way entered a drug store with the purpose of getting drugs, but because of people in the store defendant lost his nerve and they left; they took a Ford sedan not belonging to them with the express purpose of leaving town in search of drugs and drove to Thirty-third and Cuming streets, defendant himself doing the driving and not knowing much about an automobile; the story of what took place in the drug store has already been narrated; after his arrest, defendant was taken to the hospital, where he was examined and an X-ray taken, but where he received no medicines; he was later taken to the police station and on the following day was given a small amount of drugs; when he first contracted the drug habit he used heroin and from that time used it constantly until he went to California and was told they did not know what it was, but that morphine could be obtained, and he then used morphine; some time after he started the use of drugs, and for the purpose of exciting sympathy and of being able to beg money on account thereof, he used concentrated lye and gasoline upon his left forearm to produce an appearance indicative of tuberculosis of the bone, and afterwards he used other means to make himself appear as a cripple, for the purpose of begging and obtaining money to buy drugs; this use of drugs continued throughout all the period from the time he contracted the habit until the 19th day of August, and prior to that time he was using about twenty grains of morphine a day and the same amount of cocaine.

On Saturday morning they tried unsuccessfully to purchase morphine and broke into the office of certain dentists,

finding no morphine but obtaining the cocaine solution heretofore referred to. Defendant testified that he had been vomiting and going through great tortures which only an addict could explain; the cocaine solution did not seem to relieve him and on Saturday evening he was sick and running around pulling his hair and begging Smith to go out and see if he could not buy some stuff for him, and he went out and came back reporting that he could not get any; he was not able to sleep much Saturday night, having a hemorrhage of blood, vomiting and with pains all over his body; they had a few dollars between them but were unable Sunday forenoon to purchase any drugs; after running into the pole at Gibson and injuring the first car they had taken, they took another car and Smith drove for a while, but got tired driving and a little before they reached the drug store at Thirty-third and Cuming defendant was driving but was "zig-zagging" all over the street, and after they passed the store he drove the car up beyond the Boulevard, where they stopped and went back into the drug store for morphine; they did not intend to rob of anything else, but knew that in such stores they have poison cases where they keep their morphine.

Expert testimony indicates that the drug addict, contrary to general belief of the laity, does not crave drugs to produce in himself agreeable feelings, pleasant dreams, and enjoyable illusions, but he takes the drug because he cannot exist normally without it; his body will not function right until he has taken his daily dose of the narcotic to which his body has become accustomed; the sudden cutting off of a drug like morphine produces, first, a condition of extreme restlessness, and later on that restlessness reaches the degree of delirium unless alleviated; the patient suffers extreme pain in the abdomen and in all his muscles, particularly of the side and arms; soon there is a condition of nausea and vomiting, the bowels become loose, and the patient has itching and intolerable irritation all over the surface of his body; the suffering is often intense; at times the patient will go into collapse, and in frequent instances,

where the drug is entirely cut off suddenly, instead of gradually, the patient dies within 48 hours after the drug is cut off.

The evidence indicates that the defendant weighed 116 pounds when he entered the county jail and in a period of about six weeks, up to the time of the trial, had gained so that he then weighed 140 pounds. He was given treatment by the jail physician and received drugs very sparingly and only when officially administered. He paid that jail this tribute in his evidence: It was the only jail he had ever been in where narcotics could not be secured by an inmate.

The killing of so estimable a citizen as Roy L. Tinkham was a despicable act, shocking to all law-abiding people of the community. Aided by his good wife, who had worked in the store with him for 23 years, he had built up a praiseworthy reputation as a fine business man and a good citizen and had accumulated a very comfortable fortune. While the circumstances did not prevent the defendant from having a fair and legal trial, which we think the record shows he had, yet the tendency of all things naturally concurred toward a finding by the jury of the death penalty against a defendant who held the gun and fired the fatal shot. Without in any way criticizing the jury, the case makes a somewhat different appeal to us, upon reading the record and after a longer lapse of time, than it made to the jury, and probably would have made to us, on a hearing so soon after the tragic event. We think this is an instance where the judgment may be modified without doing violence either to the intent of the legislature or to the ultimate interests of society.

Under the provisions of section 10186, Comp. St. 1922, the judgment of the district court is modified to the extent that the penalty imposed is changed from the death penalty to imprisonment for life. As thus modified the judgment is affirmed.

AFFIRMED AS MODIFIED.

Note—See Homicide, 29 C. J. 1106 n. 47, 1117 n. 68, 312 n. 42; 63 L. R. A. 354; 13 R. C. L. 776; 4 R. C. L. Supp. 832.