276 F.2d 605
 UNITED STATES of America, Appellee,
v.
William LEV and Benjamin Danis, Defendants-Appellants, and
Arthur B. Mandel, Theodore Rider, Joseph Cohen, Robert S. Rosenberg, Giuseppe Battaglia and Domenico Guarna, Defendants.
 No. 269.
 Docket 25999.
 United States Court of Appeals Second Circuit.
 Argued February 11, 1960.
 Decided March 23, 1960.
 Certiorari Denied June 6, 1960.
 
 1
 See 80 S.Ct. 1248.
 
 
 2
 Leon B. Savetsky, New York City (Charles Spar, New York City, of counsel), for defendant-appellant Lev.
 
 
 3
 Henry K. Chapman, New York City (Murray E. Gottesman, on the brief), for defendant-appellant Danis.
 
 
 4
 Robert B. Fiske, Jr., Asst. U. S. Atty., So. District of New York, New York City (S. Hazard Gillespie, Jr., U. S. Atty., for the So. District of New York and David P. Bicks, Asst. U. S. Atty., New York City, of counsel), for appellee.
 
 
 5
 Before MOORE, Circuit Judge, and SMITH and HERLANDS, District Judges.
 
 
 6
 SMITH, District Judge.
 
 
 7
 Appellants Lev and Danis, Customs Inspectors of the United States Customs Service, were convicted in the Southern District of New York on trial to the jury, Judge Boldt presiding, of conspiracy with one Guarna, one Battaglia, and others unknown, to defraud the United States of free and incorrupt operation of the Customs Service by smuggling merchandise into the United States. Lev was also convicted on 21 substantive counts of soliciting or receiving bribes or smuggling; Danis on 4 substantive counts, 3 of soliciting or receiving bribes and one of smuggling. Each appellant was sentenced to 3 years imprisonment and $2500 fine on the conspiracy count, and 2 years imprisonment on each of the substantive counts, all sentences of imprisonment to be served concurrently.
 
 
 8
 The indictment, filed on April 15, 1958, contained 31 counts, charging four separate types of offenses.
 
 
 9
 Ten counts charged appellants Lev or Danis, together with defendants Giuseppe Battaglia and Domenico Guarna, with smuggling merchandise into the United States in violation of Title 18, Section 545, United States Code. (Counts 3, 5, 7, 10, 12, 15, 18, 20, 22 and 24.) Danis was named in Count 3; Lev was named in the remaining counts. In addition four other former customs inspectors, Theodore Rider, Arthur Mandel, Joseph Cohen and Robert Rosenberg, were named as defendants in Counts 7, 12, 15 and 18, respectively.
 
 
 10
 Fourteen counts charged the defendant Customs Inspectors with soliciting, demanding and receiving monies and merchandise in consideration of services performed and omitted in connection with the examination of baggage under the Customs laws in violation of Title 18, Section 213, United States Code. (Counts 1, 2, 4, 6, 8, 9, 11, 13, 14, 16, 17, 19, 21, 23.) Danis was named in Counts 1, 2 and 4. Lev was named in Counts 2, 4, 6, 8, 11, 13, 14, 16, 17, 19, 21 and 23. Rider was named in Count 9; Mandel was named in Count 13; Cohen was named in Count 17. Rosenberg was not named in any of these counts.
 
 
 11
 In addition to the substantive counts, the indictment contained five separate conspiracy counts, each charging a continuing conspiracy to violate the Customs laws through acts of smuggling and bribery in violation of Title 18, Section 371, United States Code (Counts 27-31). Count 27 named as defendants Lev, Danis, Battaglia and Guarna, and as co-conspirators "divers other persons to the Grand Jury unknown." Counts 28 through 31 charged as defendants Rider, Mandel, Cohen and Rosenberg, respectively, each defendant being named alone in a separate count. Each of these four counts charged as co-conspirators Lev, Danis, Battaglia and Guarna and "divers other persons to the Grand Jury unknown."
 
 
 12
 The remaining two counts, Counts 25 and 26, charged Lev and Mandel, respectively, with receiving, concealing and facilitating the transportation and concealment of a quantity of distilled spirits, knowing the same to have been imported into the United States contrary to law in violation of Title 18, Section 545, United States Code. These counts were severed prior to trial and were subsequently dismissed.
 
 
 13
 Prior to trial, defendants Mandel, Rider, Rosenberg and Cohen and appellant Danis moved for a severance of their trials from that of appellant Lev. The motion was denied as to Danis and was granted as to the remaining defendants. Also prior to trial, defendants Battaglia and Guarna entered pleas of guilty to all counts in which they were named, and thereafter testified for the Government.
 
 
 14
 The trial of appellants Lev and Danis began on September 28, 1959 and was concluded on October 24, 1959. Both were found guilty on all counts in which they were named. Immediately following the Lev-Danis trial, defendants Mandel, Rider, Rosenberg and Cohen were tried together before Judge Boldt without a jury. This trial began on October 24, 1959 and was concluded on October 27, 1959. Mandel, Rider and Rosenberg were convicted on the substantive counts in which they were named, and were acquitted on the conspiracy counts. Cohen was acquitted on all counts in which he was named. Lev and Danis appeal.
 
 
 15
 Battaglia and Guarna were salesmen and importers of neckwear and other merchandise from Italy. Their testimony, if believed, established that in January 1954 Danis proposed an arrangement for smuggling merchandise into New York, the savings in duty to be split 50-50. Lev was brought into the arrangement a few days after its inception, the proposal being repeated to Battaglia and Guarna by Danis in Lev's presence. Gifts of merchandise and payments of money to Danis in Lev's presence were made following the first smuggling operation, of a quantity of samples, in January 1955. Danis then told Battaglia and Guarna that he was being transferred to Idlewild, and that they could bring everything to the airport. From that point on, Lev was the contact at the dock. Lev later, in December 1955, at Guarna's request, arranged for Danis to take care of one Longhi, due to arrive by plane. Longhi's plane was, however, re-routed to Philadelphia. On two occasions shortly thereafter Danis came to Guarna's office and received two or three ties. Thereafter, Inspectors Lev, Rider, Mandel, Cohen, Farber, Goodman and Rosenberg, all passed merchandise of Battaglia and Guarna on the piers without payment of duty, Lev a number of times. Lev, Rider, Mandel and Cohen received payments from Guarna, and Lev received payments ostensibly for Farber, Goodman and Rosenberg.
 
 
 16
 Danis assigns as error the refusal of the court to rule as a matter of law that he had withdrawn from the conspiracy at the time of his transfer from the docks to Idlewild Airport. The ruling is clearly correct. Not only is there no evidence of an unequivocal act of withdrawal, but there is evidence showing continued willingness to participate in the smuggling by adding the airport as an additional smuggling channel. Battaglia did state that Danis was "out of the picture" because he was already at the airport. This is not conclusive on the question of withdrawal, but was properly left for the jury's consideration along with the other evidence in the case, including the abortive attempt to clear Longhi at the airport, and Danis' continued receipt of ties from Guarna.
 
 
 17
 Both appellants assign as error the admission against them of the acts and declarations of defendants Mandel, Rider, Cohen and Rosenberg, although Count 27 did not name them as co-conspirators, naming Guarna, Battaglia, Lev and Danis and alleging conspiracy with "divers other persons to the grand jury unknown." Even if the co-defendants cannot properly be termed "other persons unknown" and even if they did not knowingly participate in a conspiracy with Lev and Danis, the proof showed that they acted under instructions given by Lev in the carrying out of the conspiracy, and were therefore agents of the conspirators in the course of the conspiracy, so that their acts and declarations in so carrying out the conspiracy were admissible against the conspirators Lev and Danis. United States v. Miller, 2 Cir., 246 F.2d 486, 490 note 10, certiorari denied 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261; United States v. Pugliese, 2 Cir., 153 F.2d 497. 4 Wigmore, Evidence, 3rd Ed., Secs. 1078, 1079.
 
 
 18
 Counsel for appellant Lev, in cross-examining Battaglia, read questions and answers from Government's Exhibits for Identification 12 and 13. 12 for identification was a statement of Battaglia taken October 16, 1957 at the office of the Supervising Customs Agent; 13 for identification, a supplemental statement of Battaglia taken November 21, 1957 at the same place. The portions of the exhibits read by counsel for Lev from Exhibit 12 for identification were as indicated in Appendix A to this opinion.
 
 
 19
 Battaglia was cross-examined as to the accuracy and explanation of the quotations. Likewise as to quotations from Exhibit 13 for identification (Appendix B).
 
 
 20
 Counsel for appellant Danis, in cross-examining Battaglia, read from Exhibit 12 for identification (Appendix C).
 
 
 21
 On redirect examination, over objection by appellants' counsel, counsel for the government was permitted to make use of Exhibits 12 and 13 for identification (Appendix D).
 
 
 22
 The rulings of the court permitting the limited use of the extra judicial statements, not in evidence, are clearly correct. It is of course true, as appellants contend, that prior consistent statements are ordinarily not admissible on redirect for the purpose of rehabilitating the credit of a witness. 2 Wigmore, Evidence, 3rd Ed., Sec. 1125, United States v. Toner, 3 Cir., 173 F.2d 140. And a post-conspiratorial statement by a co-conspirator is no part of the conspiracy itself and is not admissible as such against his co-conspirators. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. In the case at bar, however, the appellants had used portions of the statements on cross-examination and the questions referring to the portions used by the government over objection were offered and admitted solely to round out and complete the quotations on which appellants had based the questions on cross-examination. Carefully so limited, such a use may be necessary to place in context and make more understandable to the jury the portions quoted by the defense and is permissible for that purpose even though it may also serve in some degree to rehabilitate the witness. Under the limitations imposed, the use permitted by the court was proper. See Wigmore, Evidence, 3rd Ed. 1940, Sec. 2113, pp. 526-7. United States v. Apuzzo, 2 Cir., 245 F.2d 416, 422, certiorari denied 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed.2d 43; Affronti v. United States, 8 Cir., 145 F.2d 3.
 
 
 23
 The judgments of conviction of Lev and Danis are in all respects affirmed.
 
 APPENDIX A
 
 24
 "Q. After you left the United States, in the summer of 1954, when did you return again? A. In December 1954. (Off the record in Italian with Mr. Guarna.)
 
 
 25
 "Q. You stated before that you received Inspector Danis in your office twice, once alone and once with Inspector Lev. When did the second of these visits (415) occur? A. A few days after the first.
 
 
 26
 "Q. And what brought about this visit? A. They want to talk about this matter, to import something without any declaration.
 
 
 27
 "Q. Did Inspector Lev also tell you that you could bring merchandise into the United States without declaring it and without paying duty? A. Yes, yes, yes.
 
 
 28
 "Q. And was Inspector Lev's proposition also discussed between yourself and your partner? A. Yes.
 
 
 29
 "Q. And was it also a factor in your decision to try to do something about it? A. Not right away. With time, later on, we decided to import samples.
 
 
 30
 "Q. After the second visit of Inspector Danis, at which time he brought Inspector Lev, did you leave New York and travel about the country seeking orders? A. Yes, sir.
 
 
 31
 "Q. And did you ask Inspector Danis and Inspector Lev to in the future contact your partner instead of yourself? A. We didn't have a chance to ask anything, because he was handling those people.
 
 
 32
 "Q. But Mr. Guarna was available in New York in case they came again and you were not? A. Yes. I was not. On the occasion when I had the meeting with Bill, I asked Bill `I want to know from you if something goes wrong, what happen?' because I want to know how much profit I can have, how much from the other side would be the risk, the danger" —
 
 
 33
 Mr. Fiske: "could be the risk."
 
 
 34
 — "could be the risk, the danger. He told me — his exact words — `Don't worry.' The maximum that could happen, we pay the duty. You understand? I knew the maximum could happen was to pay the duty. To pay the duty, the maximum.
 
 
 35
 "Q. Mr. Battaglia, do you recall what vessel brought you to the United States in December, 1954? A. It was — I cannot remember. It was the Andrea Doria or the Cristoforo Colombo.
 
 
 36
 "Q. And what class did you travel? A. First class.
 
 
 37
 "Q. What occurred when you came off the ship and went on to the pier? A. What happen? Some of these two people, either one, I don't remember, — there was one other sent from them. They checked my bags and they let me go out.
 
 
 38
 "Q. Was Mr. Guarna waiting to meet you? A. No.
 
 
 39
 "Q. Were both these inspectors present at that time? A. I don't remember.
 
 
 40
 "Q. Following the time you left the pier with your bags and your samples were cleared without paying duty, did you receive a further visit from either Inspector Danis or Inspector Lev at the office? A. Yes, some of them came to the office.
 
 
 41
 "Q. Who came? A. I think it was Bill.
 
 
 42
 "Q. Did anyone else come? A. I don't remember.
 
 
 43
 "Q. Did you pay Bill any money for having cleared your samples? A. Either 100 or $150."
 
 APPENDIX B
 
 44
 "Q. — this refers, this is not part of my quotation, this refers, Mr. Battaglia, to events that occurred after Inspector Rosenberg had cleared baggage at the Port of New York, so that you are not misled by me in any way.
 
 
 45
 "Q. Did you have any conversation at all with (457) Inspector Rosenberg? A. No, no.
 
 
 46
 "Q. What was the approximate amount of merchandise you had with you on that occasion which was undeclared? A. Between eight and ten thousand dollars.
 
 
 47
 "Q. Prior to this occasion, Mr. Battaglia, had you ever seen Inspector Rosenberg? A. No.
 
 
 48
 "Q. After he cleared your baggage and you left the pier, did you ever see him again? A. I don't think so.
 
 
 49
 "Q. Did he come to your office? A. I don't think so.
 
 
 50
 "Q. Do you believe that Inspector Rosenberg was paid for what he did in clearing your baggage? A. I think so.
 
 
 51
 "Q. How was he paid? A. From Mr. Lev.
 
 
 52
 "Q. Does that mean that because of this arrival Inspector Lev was paid? A. Oh, sure, he was paid.
 
 
 53
 "Q. When and where did that happen? A. As usual, I think it was paid in the office from Mr. Guarna.
 
 
 54
 "Q. And how much was he paid? — and I am referring now, of course, to any payments made by Mr. Guarna to Mr. Lev — A. As far as I know, he should have been paid either five or six hundred dollars.
 
 
 55
 "Q. How do you know this, Mr. Battaglia? A. Because I was paying $250 or $300 for my share, or Mr. Guarna was getting $500 or $600 from Battaglia & Guarna.
 
 
 56
 "Q. That means that in connection with this very arrival Mr. Guarna charged the company the $500 or $600? A. Yes.
 
 
 57
 "Q. Or charged you $250 or $300, as your one-half share? A. Yes.
 
 
 58
 "Q. However, you were not present, were you, when Mr. Guarna gave Inspector Lev the $500 or $600? A. When he gave the five or six hundred dollars I was never present.
 
 
 59
 "Q. So that you knew this only because Mr. Guarna told you? A. At the beginning, when we made the small payment, like Danis or Bill, to begin with, it was $100 or $150; that was done in my presence. When the amount went up I was never there. If I was there in the office I went to another room, because, as I told you, I don't have too much to say with these nice people."
 
 APPENDIX C
 
 60
 "Q. Was the fact that some of your customers in the United States wished to have the merchandise delivered to them clear of Customs one of the reasons why you decided to accept the inspectors' proposition and bring merchandise? A. No.
 
 
 61
 "Q. What was the reason why you decided to do this? A. Because since 1955, as we went to buy or sell in the beach shoes business (544) and we started losing a lot of money, we were in a position that we should do something to survive, because with the beach shoes we lost money, thousands dollars, and the expenses were so high between office, our traveling, our employee, and because we lost $5000 with one employee we had who stole us merchandise, money, I was obliged to arrange with Mr. Guarna to make some extra money importing merchandise without paying any duty.
 
 
 62
 "Q. What was the approximate value of these samples? A. I tell you the truth, I don't remember, but I knew it was perhaps $500.
 
 
 63
 "Q. What occurred when you came off the ship and went on to the pier? A. What happen? Some of those two people, either one, I don't remember, — there was one other sent from them. They checked my bags and they let me go out.
 
 
 64
 "Q. Was Mr. Guarna waiting to meet you? A. No.
 
 
 65
 "Q. Were both these inspectors present at that time? A. I don't remember.
 
 
 66
 "Q. Were your bags examined by any inspector? A. At that time, they didn't open the bags, because as far as I can remember last year they say there was a law — they were obliged to open all bags, but in the past that was not this condition.
 
 
 67
 "Q. Following the time you left the pier with your bags and your samples were cleared without paying duty, did you receive a further visit from either Inspector Danis or Inspector Lev at the office? A. Yes, some of them came to the office.
 
 
 68
 "Q. Who came? A. I think it was Bill.
 
 
 69
 "Q. Did anyone else come? A. I don't remember.
 
 
 70
 "Q. Did you pay Bill any money for having cleared your samples? A. Either $100 or $150.
 
 
 71
 "Q. But on this occasion the money you gave Mr. Lev was for himself rather than for both himself and Mr. Rider? A. Because for me — let's say legally, he was the leader of this situation, who was — we were dealing with him.
 
 
 72
 "Q. Your declaration indicates that the automobile was inspected and passed by Inspector Napolitano. Do you know this man? A. I remember the man vaguely. Vaguely.
 
 
 73
 "Q. By name? A. Not by name.
 
 
 74
 "Q. Did you give him anything at all for passing (561) the cheese? A. I don't remember. Usually I give something to everybody, even when they don't do anything to me. But I don't remember. Right now I don't remember."
 
 APPENDIX D
 
 75
 "Q. Mr. Battaglia, just a minute ago on your direct examination Mr. Gottesman read you some questions —
 
 
 76
 "Mr. Spar: Cross.
 
 
 77
 "Q. I am sorry. — on cross Mr. Gottesman read you some questions and answers from the statement which you had given to the Customs agents on November 21, 1957, which is Government's Exhibit 13 for identification.
 
 
 78
 "Referring to page 6 I would like to read you —
 
 
 79
 "Mr. Gottesman: The reporter has my copy, if your Honor pleases.
 
 
 80
 "Mr. Spar: He has my copy, too.
 
 
 81
 "The Court: The court reporter has it?
 
 
 82
 "Mr. Spar: Yes.
 
 
 83
 "The Court: Show them what you propose to read.
 
 
 84
 "Mr. Fiske: Page 6 of the statement of November 21, 1957.
 
 
 85
 "The Court: Some additional material that you propose to call to his attention?
 
 
 86
 "Mr. Fiske: Yes, your Honor.
 
 
 87
 "The Court: In connection with matters previously read?
 
 
 88
 "(568) Mr. Fiske: That is exactly it.
 
 
 89
 "Mr. Gottesman: Which ones are you going to read?
 
 
 90
 "(Counsel confer.)
 
 
 91
 "The Court: All right, Mr. Fiske. You propose now to read some additional material in the same statement which you consider as bearing on the matters covered in cross?
 
 
 92
 "Mr. Fiske: Yes, your Honor.
 
 
 93
 "The Court: All right, do it.
 
 
 94
 "Mr. Gottesman: We object to that your Honor, on the ground that it is not proper redirect examination.
 
 
 95
 "The Court: Overruled. He may do this. Go ahead.
 
 
 96
 "Q. Mr. Battaglia, to save time I will tell you this refers to the time when you came in in December, 1955.
 
 
 97
 "Mr. Gottesman: Then we object to it, your Honor. It is in no way binding on the defendant Danis.
 
 
 98
 "The Court: Objection overruled. Go ahead.
 
 
 99
 "Q. `Q. And did you pay Inspector Lev? A. Mr. Guarna paid Inspector Lev.
 
 
 100
 "`Q. How much did he pay him? (569) A. I think $300, because as far as I remember was not that important, the entrance of merchandise.
 
 
 101
 "`Q. Did you offer Inspector Rider or Inspector Lev any reason why you paid them each separately? A. I paid something to Mr. Rider because for me who did the work was Mr. Rider. And I did not know how much he was going to get from Lev, because I had an impression that that occasion, any other occasion Mr. Lev, when he didn't do everything by himself, he was getting for him most of the money.'
 
 
 102
 "Do you remember being asked those questions and giving those answers? A. Yes, I remember those questions.
 
 
 103
 "Q. Also, Mr. Battaglia, on your cross-examination by Mr. Spar you were asked certain questions and gave certain answers relating to the statement which you gave on October 16, 1957, relating to the time when you came in in December, 1956, a year later, and I would like to read you further questions and answers relating to that same transaction and ask you whether or not you were asked these questions and gave these answers. This is starting at page 21.
 
 
 104
 "The Court: Same objection, same ruling.
 
 
 105
 "Q. `Q. Will you tell me what the circumstances (570) were on December 8, 1956, when you offered your baggage for inspection? A. I went on the pier, under my letter, waiting for my bags, and then I spoke with Mr. Guarna and I told him to make sure that the thing could be done, because I didn't see Bill over there. And then Mr. Guarna showed me which one was the man who was going to make the operation for me. He told me which one was the man, first, that was going to make the operation, and then when I saw the man was behaving with me like I was any customer, you know — he didn't let me understand that he was helping me, so I started to worry, and I told him (Guarna) "Call Bill, otherwise I will declare everything." Then Bill came and he told me "Don't worry," this man was dealing with us. But still the man told me that I was obliged to open everything, which surprised me, because when I opened everything right away everybody could see what kind of merchandise it was in the trunks, and I was more worrying, because I somehow saw something around that I never saw before, and then I asked what was going on there; they told me they were looking for somebody else under my letter "B" — they were checking for drugs, narcotics or something like this. And Bill (571) insists to me "Don't worry, everything is all right." So we close all the trunks, we put everything on the truck, we went away. This is as it happened.
 
 
 106
 "`Q. Did you say anything to Inspector Rosenberg about declaring the merchandise? A. No, I didn't say anything, because I was worrying I have wrong — as far as he was — He knew about it. And some time it seemed to me he did not know anything but he was doing a favor to Mr. Lev.
 
 
 107
 "`Q. However, he did open the trunks which had the merchandise, didn't he? A. Yes. All the trunks were opened. All of them.
 
 
 108
 "`Q. And was it obvious from just what could be seen on top of the trunks that there was merchandise? A. Yes, because the trunks, they were given us from the manufacturer just like they should arrive declared; nothing was hiding the merchandise, you understand? This proves too that the Galliene was in good faith; otherwise we could take all the' —
 
 
 109
 "I will omit the rest of that answer because it doesn't relate to the particular subject.
 
 
 110
 "`Q. Was this the same type trunk as came in on October 1, 1957?'
 
 
 111
 "Mr. Gottesman: Just a moment. If your Honor pleases, I have sat here very patiently. Are we going to read this entire transcript?
 
 
 112
 "The Court: I realize that it is difficult sometimes to pick out the particular thing without getting it out of context, but don't read unnecessary repetition, Mr. Fiske.
 
 
 113
 "Mr. Fiske: I will abide by your Honor's ruling. I will state what I had planned to do and perhaps your Honor could rule in advance and save some time, if you wish.
 
 
 114
 "The Court: All right.
 
 
 115
 "Mr. Fiske: Mr. Spar had read some questions and answers relating to this particular examination and I had planned to read the entire questions and answers relating to it which run on another two pages.
 
 
 116
 "Mr. Spar: I submit —
 
 
 117
 "The Court: What would be the purport of doing that?
 
 
 118
 "Mr. Fiske: The purport of it, your Honor, is under the doctrine of completeness, I believe, when something is read on the subject we are entitled to read in everything that was said on the same subject.
 
 
 119
 "The Court: Yes, but there be any suggestion that there was some reference to something in this other material that counsel inferred was not covered or something, you can pick that out and read it but otherwise I don't want you to read the whole thing in blind adherence to a rule of completeness.
 
 
 120
 "Mr. Fiske: All right, your Honor, I will accept your ruling and I won't go any further.
 
 
 121
 "The Court: All right.
 
 
 122
 "By Mr. Fiske:
 
 
 123
 "Q. Incidentally, Mr. Battaglia, did anyone ever show you either of these statements —
 
 
 124
 "Mr. Gottesman: Just a minute. Objected to. That is certainly not proper redirect.
 
 
 125
 "The Court: I think it is. Overruled.
 
 
 126
 "Q. Did anyone ever show you, Mr. Battaglia, either of these statements, Government's Exhibits 12 or 13 for identification, that you have been questioned about? A. The only paper I saw was the copy of the indictment.
 
 
 127
 "Mr. Fiske: Thank you.
 
 
 128
 "The Court: Any recross?
 
 
 129
 "Mr. Fiske: I have some more questions.
 
 
 130
 "Mr. Gottesman: May I state for the record (574) the purpose of our objection to the last question that nobody has for one instance asked this gentleman any questions as to whether he had read these things or it had been read to him.
 
 
 131
 "The Court: I still think it was appropriate on redirect.
 
 
 132
 "Mr. Spar: May I at this time, if the Court please, with the stenographer and counsel, approach the side bar?
 
 
 133
 "The Court: Yes."
 
 
 134
 (The following occurred at the bench, not in the hearing of the jury:)
 
 
 135
 "Mr. Spar: If your Honor pleases, at this time, on behalf of the defendant Lev, I respectfully move for a mistrial by withdrawal of a juror on the ground that the United States attorney has severely prejudiced the rights of the defendant Lev in standing up before the jury and reading from a record not in evidence and just reading question and answer without asking the witness any questions as to whether they were made. They were improper redirect questions. It was an attempt to inflame the jury on the basis of a statement that is not in evidence, and I say to your Honor that the defendant Lev has been sorely (575) prejudiced by the conduct of counsel.
 
 
 136
 "The Court: Motion denied and exception allowed.
 
 
 137
 "Mr. Gottesman: The defendant Danis joins and on an additional ground, on the ground that those questions are so highly prejudicial in view of the fact that the witness on his own testimony has conceded he never saw the defendant Danis again after the middle of January, 1955.
 
 
 138
 "The Court: That motion likewise is denied and an exception allowed. I can only say that it seems to me that the redirect examination is merely adding additional portions of data that were read to the witness on cross even though that document was not in evidence at the time, and it seems to me to be only fair matter to add such portion of the man's statement at that time as seem to bear on the same subject matter. The motions are denied and exception allowed."
 
 
 139
 (Proceedings were resumed within the hearing of the jury as follows:)
 
 
 140
 "By Mr. Fiske:
 
 
 141
 "Q. Mr. Battaglia, going back to the material I just read to you from Exhibit 12 for identification relating to the events of December, 1956, let me ask (576) you whether or not you were asked those questions and gave those answers that I have read to you?
 
 
 142
 "Mr. Spar: Objection, your Honor.
 
 
 143
 "The Court: Overruled. He may answer. The question now is were the questions put and the answers given that Mr. Fiske has read you from the same statement.
 
 
 144
 "A. Yes, I think so."