State of Nebraska, appellee, v. Ewther Hall, appellant.

125 N. W. 2d 918

Filed January 31, 1964. No. 35502.

Adolph Q. Wolf, Edward T. Hayes, and Fred J. Montag, for appellant.

Clarence A. H. Meyer, Attorney General, and Melvin K. Kammerlohr, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, SPENCER, BOSLAUGH, and BROWER, JJ., and LYNCH, District Judge.

MESSMORE, J.

This is a prosecution upon an information filed by the State of Nebraska against Ewther Hall, appellant, hereinafter referred to as defendant, that he did, while in the perpetration or attempt to perpetrate a robbery, kill Albert Alfred Anderson which constituted the charge of murder in the first degree. Another information charging the same crime was filed against Curtis Eugene Rowland. The State filed a motion requesting that the two cases be consolidated. This motion was sustained. The jury returned a separate verdict for each defendant. The defendant in the instant case was found guilty of murder in the first degree as charged in the information, and the penalty was fixed as death. Motion for a new trial on the part of the defendant Hall was overruled, and this defendant was granted leave to file a motion for rehearing within 1 week, which motion was overruled. The motion for new trial on behalf of defendant Rowland was sustained. Defendant Hall was sentenced

to suffer the death penalty. Defendant Hall brings the case to this court for review.

The defendant Hall moved for separation of the two cases because his counsel was informed by competent experts that this defendant was a person of very low mentality and that his right to have a fair trial might be prejudiced by the presence of the defendant Rowland. The defendant Rowland moved for a separate trial on the ground that the testimony of a psychiatrist, a witness for the defendant Hall, would be adverse to the interests of the defendant Rowland. The above motions were overruled.

In State v. Brown, 174 Neb. 387, 118 N. W. 2d 328, section 29-2002, R. S. Supp., 1961, is set forth and provides in part as follows: "Two or more defendants may be charged in the same indictment, information, or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. * * * If is (it) appears that a defendant or the state would be prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires." The court said: "The right to a separate trial now depends upon a showing that prejudice will result from a joint trial. A motion for a separate trial is addressed to the sound discretion of the trial court, and its ruling on such a motion will not be disturbed in the absence of a showing of an abuse of discretion. Opper v. United States, 348 U. S. 84, 75 S. Ct. 158, 99 L. Ed 101, 45 A. L. R. 2d 1308; 53 Am. Jur., Trial, § 56, p. 65; 23 C. J. S., Criminal Law, § 933, p. 696.

"The fact that one of several defendants had made an admission which may be received in evidence against

him is not a conclusive ground for ordering the defendants tried separately even though the admission incriminates the other defendants. United States v. Caron, 266 F. 2d 49; Costello v. United States, 255 F. 2d 389. There is some danger of prejudice in any trial involving multiple defendants but severance should be denied in the absence of a showing of prejudice against which the trial court will not be able to afford protection. United States v. Lev, 22 F. R. D. 490, 276 F. 2d 605."

Defendant Hall contends that without the confession of Rowland the State had a doubtful, circumstantial case against him which would not prove his guilt beyond a reasonable doubt. This contention is without merit as a summary of the evidence will disclose.

With reference to the confession of the defendant Rowland, the trial court made clear and repeated admonitions to the jury at appropriate times that Rowland's statements were not to be considered in establishing guilt against defendant Hall, and that such evidence as to defendant Hall constituted hearsay evidence.

As stated in United States v. Kahaner, 203 F. Supp. 78: "The general rule is that persons jointly indicted should be tried together, particularly so where the indictment charges * * * a crime which may be proved against all the defendants by the same evidence and which results from the same or a similar series of acts." Many cases are cited to this effect. The court went on to say: " '* * * the defendant is entitled to a separate trial as a matter of right only upon a showing of prejudice * * *.' * * * The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though

the task be difficult, severance should not be granted."
See, also, Wiley v. United States, 277 F. 2d 820.

In the instant case the trial court gave long-approved
cautionary instructions to consider any statement or con-
fession only as to the defendant making it. The record
in this case does not establish that the trial court abused
its discretion in overruling the motions of the defend-
ants for separate trials. This contention cannot be
sustained.

The widow of Alfred Anderson, the victim in the in-
stant case, testified that her husband drove a cab for the
Checker Cab Company, and was so employed on De-
cember 9, 1961. He came to her room in the hospital
where she was a patient. He had on gray slacks, a
shirt, and a gray jacket, and had his glasses on. He
asked her if she needed money, and she saw the bill-
fold which he carried. He left the hospital about 8:30
or 8:35 p.m., and the billfold at that time was in his
pocket.

An employee of the Checker Cab Company on duty
on December 9, 1961, whose duties required taking
orders over the telephone from anybody who wanted a
cab, testified that she would write the order out and
turn it over to the dispatcher. On December 9, 1961,
a telephone call was received for a cab. The request
came from Twenty-fourth and Cuming Streets. The
cab was to stop at the Thull drugstore on that corner.
The name given was John, and the call came in right
after 8:30 p.m. The order was given to the dispatcher.

The dispatcher took the order and dispatched a cab
to Twenty-fourth and Cuming Streets, and gave the
driver the name of John. The driver of the cab checked
with the dispatcher by radio and indicated the number
of the cab, which was cab No. 12. An exhibit shows this
action took place on December 9, 1961, at 8:36 p.m.

A driver of a bus for the Omaha Transit Company was
driving a bus the night of December 9, 1961, and stopped
the bus at Twenty-fourth and Cuming Streets around

8:37 or 8:40 p.m. The bus was headed south. Thull's drugstore was on the northwest corner of the intersection and a service station on the northeast corner of the intersection. There was a public telephone booth on the driveway of the service station. This driver observed two persons crossing Twenty-fourth Street from the east to the west on the north side of Cuming Street. They crossed Twenty-fourth Street and stood on the curb. The bus was parked at the curb on the northwest corner. One of the persons was taller than the other, and they were colored male persons. When the bus moved on these persons were at the east wall of the drugstore. The bus left at about 8:40 p.m. At the trial this witness identified and pointed out these two persons, who were the defendants.

The manager of a cafe at 2403 Cuming Street near Thull's drugstore, testified that she was on duty on December 9, 1961; that she observed a Checker cab which came to the intersection of Twenty-fourth and Cuming Streets and stopped right beside Thull's drugstore on the Cuming Street side; that she was looking out of the window and saw two persons get into the cab; that these persons were colored; and that one was a little shorter than the other.

The defendant gave a statement which was read into evidence. He stated that he was 19 years old; that he was born in Stuttgart, Arkansas; and that he came to Omaha in 1955, and lived with his aunt. He had known the defendant Rowland for 2 years. Rowland talked to him about committing a robbery. The defendant told Rowland that he had never "pulled a job" and "wasn't for pulling the job." The evening the crime was committed, the defendant went to Rowland's house and Rowland asked him again about perpetrating a robbery. The defendant had been drinking. Rowland called a cab from a telephone booth at Twenty-fourth and Cuming Streets. The cab arrived, and Rowland and the defendant entered it. The cab stopped at 1510 North

Twenty-ninth Street. Rowland passed a hammer to the defendant. Rowland put a gun in the cabdriver's back and told the defendant to hit the driver with the hammer, which the defendant did, twice. The cabdriver was not "knocked out" and was begging. The defendant got out of the cab and told Rowland to come with him. When he left the cab the defendant heard a shot. He ran away and went to Rowland's house. Rowland had shown him the gun 2 or 3 weeks before, but the defendant did not know Rowland was going to use it. When he hit the cabdriver with the hammer he asked the cabdriver for money, and the cabdriver handed him about four dollars in change.

Later another statement was given by the defendant in which the defendant stated that Rowland used the hammer and the defendant shot the cabdriver and took his wallet from his pocket. The wallet contained $50. The defendant and Rowland divided the money in the basement of Rowland's house. Rowland told the defendant five or six times to put the gun on the cabdriver. The defendant further stated that he shot the cabdriver because he was nervous and upset and did not know what to do; and that Rowland told him to shoot the cabdriver but he did not want to do so.

A witness testified that he was in the vicinity of Twenty-ninth and Charles Streets on December 9, 1961, between 9 and 10 p.m., driving his car to his home. As he approached Charles Street the reflection of his car lights showed a person lying right by the sidewalk, face down. This witness attempted to assist such person, but was unable to move the body, so he went next door, told the people what had happened, and asked them to call the police and the emergency squad.

Another witness who was with this witness testified to substantially the same facts.

A police officer on duty on December 9, 1961, went to the vicinity of Twenty-ninth and Charles Streets in response to a radio call to pick up a man at that location.

He and his partner arrived at the scene 2 or 3 minutes after 9 p.m. This officer described where he found the body of this man and the man's condition, and stated that he called the rescue squad. He further testified that just north of the intersection there was a Checker cab the door of which was open, and the taillights and dome light were on. The fire department rescue squad came and removed the body shortly after 9 p.m.

A safety engineer employed by the Checker Cab Company on December 9, 1961, went to the scene of the crime and found the Checker cab at the intersection of Twenty-ninth and Charles Streets. He arrived at the scene of the crime between 9:15 and 9:30 p.m. He testified that the cab was number 12, and was issued to Albert Anderson. He identified a trip sheet which showed the point of origin of the last trip made by cab number 12 to be Twenty-fourth and Cuming Streets and also that the cabdriver received the call by radio. No destination was shown on the trip sheet. This witness went to the emergency room at the hospital and identified the body of cabdriver Anderson.

A doctor affiliated with the Douglas County Hospital on December 9, 1961, assigned to the emergency room, examined the body of a man brought in by the rescue squad at about 9:25 p.m. He determined that the man was dead, noticed lacerations on his head, and found a bullet hole just below the shoulder blade on the left side.

A physician performed an autopsy on the body of Anderson on December 10, 1961, at the Douglas County Hospital. He described the wounds received by the deceased and the gunshot wound. He testified that death resulted from hemorrhage caused by the bullet wound. He removed an oval metallic slug from the body of Anderson.

Suffice it is to say that the clothing worn by Anderson at the time of his death was identified; the revolver used in the robbery and killing of Anderson was identified as being in the possession of Rowland prior to the

commission of the crime; and the bullet which killed Anderson and was lodged in his body was positively identified as being fired from the revolver which was owned by Rowland.

We eliminate from the evidence any reference to statements made by Rowland for the reason that the trial court, as heretofore mentioned, properly admonished the jury that such statements pertained only to Rowland's guilt, if any, and was hearsay as to the defendant Hall's guilt.

A psychologist connected with St. Joseph's Hospital in Omaha testified that psychologists are concerned with measuring abilities, personalities, and aptitudes for various kinds of work. This doctor teaches individual mental tests and applied psychology at Creighton University and at the Creighton Medical School. He uses the Wechsler Adult Intelligence Test, which is a standard test. He explained that this test has eleven parts, and detailed each part of the test. He further testified that the defendant was given this test and scored 73 in the verbal scale, 56 in the performance scale, and had a full scale intelligence quotient, or I. Q. of 64, which placed the defendant in the defective classification of mental ability. This witness testified that the average human range on the Wechsler scale would be from 91 to 110; and that 2.2 percent of the population fall within the section of 65 or under. This is classified as mental defective or feebleminded. He further testified that 98 percent of the population in the defendant's age group excel him mentally; that the defendant was 19 years old, being born on October 28, 1944; that the tests took 2½ hours; and that the defendant's judgment is very low. He further testified that while the test is not particularly based on mental age, however the defendant's mental age was somewhere around the 8-year-old level. This witness further stated that a person like the defendant is easily led to do things, and easily influenced by other persons.

A psychologist from New York University, a diplomat

in clinical psychology awarded by the American Board of Examiners in professional psychology, and now associate professor of psychology at the University of Nebraska, examined the defendant on September 7, 1962. He testified that he used the Wechsler, Bender Visuale Motor Gestalt, Stanford-Binet, and Rorschach tests; that the score on the Wechsler test was 64, which is within the mentally retarded range, and is poorer than 99 out of 100 people. The Stanford-Binet test scores mental age. The defendant, in this area, was below the mental age of 5 years. This condition had prevailed all of defendant's life. A normal I. Q. is 90 to 110. He further testified that the defendant falls within the mentally retarded range.

A licensed physician, chief of the psychiatric service at St. Joseph's Hospital, and physician member of the Board of Mental Health of Douglas County for over 10 years, examined the defendant on September 16, 1962. The defendant was unable to do simple problems in arithmetic, was unable to spell his name, and was unable to read or write. This witness testified that the defendant has a petit mal, a mild form of epilepsy; that the defendant's judgment is commensurate with his intellectual capacity; that the defendant is a high-grade idiot or low-grade moron; and that he has been defective all of his life. From clinical experience, this doctor would place the defendant in the I. Q. level of the 50's or 60's, a mental age from 6 to 8 years, and grossly retarded. The defendant gave a history of having fallen off the back end of a truck when he was 12 years of age, was sick about a week, and since that time has had blackouts.

A specialist in psychiatry and neurology examined the defendant on September 8, 1962. This witness testified that the defendant was unable to read or write, to do simple arithmetic sums, or to spell; that he was mentally defective, feebleminded; that this doctor frequently recommended persons being put in an institution for

the feebleminded who were smarter than the defendant; that the defendant had an I. Q. of about 60; that the defendant likely had a petit mal epilepsy; that there are times when his I. Q. might be at the level of about 40; that this is a positive diagnosis; that the defendant is a passive person who wants to please; that the doctor doubted that the defendant could earn a living; that an employer would have to stand over him in constant supervision; that the defendant's mental age is about 7½ years; that the average 7-year-old would do much better than the defendant; that in fact the defendant is closer to 5-year-old and is not as smart as his 65 I. Q. shows because his performance test was 51, which constitutes a closer evaluation of his ability; and that the defendant is a low-grade moron or a high-grade imbecile, and is feebleminded. The State cross-examined this doctor, over objections of the defendant, as to whether or not the defendant knew the difference between right and wrong on December 9, 1961. The doctor answered that the defendant would only know such difference between right and wrong as a 5 to 8-year-old person would know it.

An elementary school principal at Star City, Arkansas, since 1954, testified that he knew the defendant as a student and had known him since 1954; that he believed the defendant spent his entire years of education in this school; and that the defendant was present in school in 1954, 1955, 1956, and part of 1957 and 1958. Exhibits were received in evidence which were kept by this principal as a register of grades of students, and showed the grades that were given the defendant during the time he was a student at the school. Commencing with the fifth-grade records, the defendant had a "B" in deportment, but all other grades were "D". This witness testified that under the grading system used "D" indicated from 60 to 69, but does not properly reflect the defendant's grades; that the defendant was passed on what is known as a "social promotion" to keep him in

his age group, and the grades were given him for that purpose only; that the defendant could not recite in class; that the defendant seldom played and when he did he played with younger children; and that he was given the job of cleaning the buses. This witness further testified that he did not believe the defendant learned anything; that he was unable to learn to read, write, or spell; that the school was segregated; that it had no vocational counseling, medical facilities, or psychiatric facilities which were furnished in a Caucasian school; that the defendant was not a discipline problem; and that to his knowledge there was never a student like the defendant in the school, one who failed in every subject.

A doctor who had previously testified was recalled on rebuttal and, over objection, was asked if the defendant knew the difference between right and wrong on December 9, 1961. The doctor replied that he did, but then stated that the defendant knew the difference between right and wrong at about the level of a 6 to 8-year-old person.

The State called a psychiatrist in rebuttal who testified that the defendant knew right from wrong on December 9, 1961; and that the defendant could not do complex things such as arithmetic and things requiring complex mental activities. This doctor did not suspect a petit mal. He testified that he would not set a mental age for the defendant. He found no evidence of psychosis. He gave the defendant's I. Q. as about 80.

The defendant contends that the trial court committed prejudicial error by instructing the jury on the issue of insanity, which was not a defense raised by the defendant; and that the defendant in a criminal case has a right to have his theory of defense properly submitted to the jury.

The defendant relies principally upon the case of Washington v. State, 165 Neb. 275, 85 N. W. 2d 509, and also cites authorities from foreign jurisdictions and texts

such as 26 Am. Jur., Homicide, § 105, p. 228, and 41 C. J. S., Homicide, § 399b, p. 237, and note 31, which have been examined.

With reference to Washington v. State, *supra,* the defendant was found guilty of first degree murder and presented evidence of his low mentality. The trial court instructed the jury that the degree of defendant's intelligence was not a defense and could be considered by the jury solely in connection with the penalty to be imposed. This court held the instruction to be reversible error, and that the jury should be entitled to consider the level of mental capacity of the defendant in determining whether or not he had the necessary intent and deliberate and premeditated malice, elements of the crime of which he was charged. The situation is different in the instant case. The court, in clear and definite instructions, instructed the jury as to the necessary intent to commit the robbery which resulted in death, and gave the general instruction on intent that is given in criminal cases where intent is a necessary element of the offense charged. Washington v. State, *supra,* discloses nothing which states it is error to instruct on insanity when evidence of low mentality has been introduced. The fact is, the law is well settled that the test is whether or not the defendant knows the difference between right and wrong, or understands the nature and quality of his act, and not whether it is called insanity or feeblemindedness. See 40 C. J. S., Homicide, § 4c, p. 827.

In the case of People v. Perry, 195 Cal. 623, 234 P. 890, there is language applicable to the instant case, as follows: "It is urged by the appellants that the court erred in giving the jury any enlightenment whatever on the subject of insanity. None of the instructions is challenged as being incorrect statements of the law, but it is insisted that no instructions whatever should have been given defining mental unsoundness for the reason that no claim was made that any one of the defendants was insane. It is, perhaps, true that no specific use

was made of the word 'insanity' by counsel, but five alienists, or psychologists, were called by the defense and gave testimony bearing directly on the mental deficiency of * * * (one of the defendants). * * * The experts testified that his intellectual quotient, as gauged by the Binet-Simon test, Leland Stanford Jr. University Revision, was no higher than that which a normal boy should register at the age of 11 years. But the law does not substitute mental standardization in place of actual age as the sole test of responsibility for the commission of crime. * * * We know of no decision, and none has been cited, which holds, that if a person offers evidence in his own behalf as to his mental infirmity with the object of mitigating his punishment, the court thereby becomes powerless to instruct the jury as to the legal standard by which accountability is to be determined. Insanity is a broad subject and includes many forms of mental disorders and degrees of mental weaknesses, and the kind and degree that will excuse crime is definitely settled by many decisions of this court."

It appears that the instruction given by the trial court on insanity in no manner could have been prejudicial to the defendant, but gave him an opportunity to utilize this defense and have the same considered by the jury, and the possibility of its finding him not guilty by reason thereof.

As stated in State v. Easter, 174 Neb. 412, 118 N. W. 2d 515: "Defendant may not predicate error on an instruction that is more favorable to him than is required by the law applicable to the charge made. Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632."

The defendant's contention cannot be sustained.

The defendant contends that he was denied a fair trial by instruction No. 13 which instructed the jury to consider separately the guilt or innocence of each defendant, but failed to instruct that the matter of penalty to be imposed should also be considered separately.

Instruction No. 25 sets forth all of the alternatives in

the matter of penalty as to the defendant in the instant case separately, should the jury find him guilty, and the alternatives if they should find him not guilty. The same instruction then sets forth the alternatives as to the other defendant, Curtis Eugene Rowland, separately.

It is well established in this jurisdiction that where the charge to the jury, considered as a whole, correctly states the law, the verdict and judgment will not be reversed merely because a single instruction, when considered separately, is incomplete. See, Kirkendall v. State, 152 Neb. 691, 42 N. W. 2d 374; Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151; Rains v. State, 173 Neb. 586, 114 N. W. 2d 399.

"Where the punishment is to be assessed by the jury, instructions clearly and concisely stating the law as to the power and discretion of the jury properly to assess the punishment should be given; * * *." 41 C. J. S., Homicide, § 399, p. 235.

In the instant case the court properly instructed the jury on this phase of the case. The defendant's contention is without merit.

The defendant contends that the facts and circumstances in the instant case disclose that the defendant is feebleminded and of an immature age, and taking these facts together they do not warrant the imposition of the death penalty.

Section 29-2308, R. R. S. 1943, provides in part as follows: "In all criminal cases that now are, or may hereafter be pending in the Supreme Court on error, the court may reduce the sentence rendered by the district court against the accused, when in its opinion the sentence is excessive, and it shall be the duty of the Supreme Court to render such sentence against the accused as in its opinion may be warranted by the evidence."

The above section should be liberally construed in favor of justice. See Cryderman v. State, 101 Neb. 85, 161 N. W. 1045.

We have come to the conclusion, from a careful examination of the record, that there is no error prejudicial to the defendant. The defendant was guilty of first degree murder. There can be no question. This court has held many times, in conformity with section 28-401, R. R. S. 1943, that a homicide committed in the perpetration of a robbery is murder in the first degree, and in such a case the turpitude of the act supplies the element of deliberate and premeditated malice. See, Pumphrey v. State, 84 Neb. 636, 122 N. W. 19, 23 L. R. A. N. S. 1023; South v. State, 111 Neb. 383, 196 N. W. 684; Swartz v. State, 118 Neb. 591, 225 N. W. 766; Rogers v. State, 141 Neb. 6, 2 N. W. 2d 529.

We believe, from a review of the record, that the interests of society do not demand that the death penalty be inflicted. It appears to us that life imprisonment is adequate punishment for the offense. Consideration of all of the circumstances, that is, the age of the defendant, that he is a feebleminded person, a low-grade moron or a high-grade imbecile, passive in nature, possessed of a disposition to follow the lead of others, and who previously had no offense charged against him, indicates that the reduction of the death penalty to one of life imprisonment is warranted. See, Rogers v. State, *supra;* O'Hearn v. State, 79 Neb. 513, 113 N. W. 130, 25 L. R. A. N. S. 542; Wesley v. State, 112 Neb. 360, 199 N. W. 719.

We have no desire to criticize the jurors in any manner. They should be commended for fulfilling their duties in this case.

Having concluded that imprisonment for life should constitute the penalty in this case, we modify the judgment of the trial court to the extent of reducing the penalty from death to life imprisonment. In all other respects the judgment of the trial court is affirmed.

AFFIRMED. SENTENCE REDUCED.