(No. 7130. February 24, 1944.)

STATE OF IDAHO, Respondent, v. WILLIAM BEHLER, Appellant.

[146 Pac. (2d) 338.]

Harry J. Hanley and J. H. Felton for appellant.

Bert H. Miller, Attorney General; J. R. Smead, Assistant Attorney General; and Wilbur L. Campbell, Prosecuting Attorney, for respondent.

HOLDEN, C.J.—In March, 1943, John P. Gilbertz owned and was operating a store at Ferdinand, Idaho. Shortly prior to March 7, 1943, while William Lipps was in a hospital at Grangeville, Idaho, appellant went to and entered Lipps' home and took therefrom a Winchester "forty-four" rifle belonging to Lipps. About a week later, to-wit, March 12, 1943, appellant went to Ferdinand and at about three o'clock in the morning of that day broke a window by the front door of the store and then unlocked the door and went to the back end where he ate some crackers and cookies and waited until Gilbertz came to the store at about half past seven o'clock. Apparently, while Gilbertz was building a fire in a stove in the store, appellant shot him. After he shot Gilbertz the first time and while Gilbertz was down on the floor appellant shot him again. Thereupon appellant left the store and returned to his cabin near Ferdinand. At about twenty minutes after eight Robert Gilbertz, sixteen-year-old son of the deceased, went down to the store and found his father lying on the floor near the stove, and after trying to revive him, notified a Mr. Remacle. It was at first thought Gilbertz had suffered a heart attack, but an examination by the coroner quickly established the fact Gilbertz had been shot. The authorities at the county seat, Grangeville, were promptly notified and the sheriff immediately organized a posse. Appellant having been seen

shortly after the commission of the crime leaving Ferdinand carrying a rifle, the posse immediately went to the Behler cabin, and in the course of repeated demands that Behler come out and surrender, several shots were fired through the windows, and later the cabin was set on fire. Very shortly thereafter Behler came out of the cabin and surrendered. William Lipps' rifle, taken by appellant in the manner above stated (the rifle with which the killing was done), was found in the doorway of appellant's cabin by a member of the posse. Appellant, immediately following his arrest, admitted killing Gilbertz. He was taken by the sheriff and his posse back to Ferdinand and then from Ferdinand on to Grangeville, where the party arrived at about 5:30 in the evening. Upon arrival at Grangeville, appellant made a confession in the office of the county attorney. The confession was taken in shorthand by the county stenographer. The next morning appellant was taken before a committing magistrate where he waived a preliminary examination and was bound over to the district court on a charge of first degree murder.

March 15, 1943, an information was filed against appellant in the District Court of the Tenth Judicial District in and for Idaho County. Following arraignment and the appointment of counsel to represent him his trial was set for Monday, March 22, 1943. On that day, when the case was called for trial, "the question of the sanity of the defendant being raised by counsel for the defense the court ordered a hearing on the sanity of the defendant," at the time of the trial, not at the time of the homicide. Whereupon an inquiry into the sanity of appellant was had as provided by chap. 32, sec. 19-3201, et seq., I.C.A. The jury duly and regularly sworn and impaneled to try appellant on the question of his sanity at the time of the trial, found appellant was then sane.

May 3, 1943, appellant was tried. May 8, 1943, the jury, duly sworn and impaneled to try appellant for the commission of the crime charged in the information filed March 15, 1943, as aforesaid, found appellant "guilty of murder in the first degree and he shall suffer death." May 11, 1943, "judgment on Conviction of the Crime of Murder in the First Degree" was rendered and entered. June 7, 1943, an appeal from that judgment was prosecuted to this court.

A reversal of the judgment is sought by appellant

upon the several points hereinafter discussed. First, that it is the duty of a sheriff, when arrest has been made to bring the defendant before a committing magistrate without unnecessary delay.

The pertinent parts of secs. 19-515 and 19-615, I.C.A., provide:

"[19-515.] The defendant must in all cases be taken before the magistrate without unnecessary delay, * * *"

"[19-615.] When an arrest is made without a warrant by a peace officer or private person the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person, must be laid before such magistrate."

In support of the contention there was unnecessary delay, appellant cites *Madsen v. Hutchison,* 49 Ida. 358, 361, 362, 290 P. 208. That was an action to recover damages for false imprisonment. There, it appears, "The sheriff failed to take the prisoners (the Madsens) before a magistrate and made no effort to do so", to quote the language of this court. We then held that: "After making an arrest an officer should be given some latitude in complying with the mandate of the statute and the warrant, and circumstances may justify a reasonable delay." It was then pointed out that "A magistrate was available. The time was midday. The prisoners were tractable. At 8 o'clock in the evening, their mother having procured bail, the prisoners were released on the orders of the magistrate who had issued the warrant. But at no time during their confinement were they taken before him."

After some further discussion, this court said:

"It should be observed that this breach of duty (to take the Madsens before a committing magistrate) arises from the officer's total failure to act; that he does not fail in any duty if he merely delays a reasonable length of time in taking the prisoner before a magistrate, or for a longer time, if a longer delay is justified by all the circumstances of the case."

In *Madsen v. Hutchison,* supra, it will be noted it was midday when the Madsens were arrested, but that, nevertheless, the sheriff not only failed to take his prisoners before a magistrate, but made no effort to do so. Here, the

sheriff did not arrive with his prisoner at Grangeville until about 5:30 in the evening; and here, the sheriff did take appellant before a committing magistrate the next morning and, furthermore, when appellant was taken before a committing magistrate, he waived preliminary examination.

■ Second, "An arresting officer, charged with the duty of bringing the prisoner before the nearest committing magistrate without delay, and if he delays for the purpose of obtaining a confession, it is invalid and cannot be used against him," citing *McNabb v. United States*, 87 L. ed. 579, 63 Sup. Ct. 608, *Anderson v. United States*, 87 L. ed. 589, 63 Sup. Ct. 599, relied upon to support that contention.

In *McNabb v. United States*, supra, it appears the McNabbs were given what is commonly known as the "third degree." Discussing that practice, the court said:

"For this procedural requirement (to take prisoners before a United States commissioner) checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement. It outlaws easy but self-defeating ways in which brutality is substituted for brains as in instrument of crime detection."

The court then held the confessions obtained by third degree methods were inadmissible, but pointed out "the mere fact that a confession was made while in the custody of the police does not render it inadmissible." (Citing cases.)

In the instant case appellant was not given the "third degree," nor were any practices indulged which even hint of third degree methods, nor was "brutality substituted for brains." Furthermore, upon his trial, appellant went on the witness stand and testified substantially to what he had confessed in the office of the county attorney.

*Anderson v. United States*, supra, is another case where third degree methods were employed, and what has been said of the McNabb case applies with equal force to the Anderson case. Both cases were argued at the October, 1942, term of the Supreme Court, and opinions (both written by Mr. Justice Frankfurter) were handed down March 1, 1943.

■ Third, that: "This court has formerly held that a confession extorted from a half-witted boy should not be

permitted in evidence," citing and relying upon *State v. Mason*, 4 Ida. 543, 547, 43 P. 63.

It appears Mason was jointly indicted with one Hammon for the crime of arson. On arraignment, separate trials were given the defendants. Hammon was tried and acquitted. On the trial of Mason, a written confession (which the court says was extorted from him by one McCarty, a detective in the employ of the Continental Insurance Company), was offered and admitted in evidence. It also appears there was no evidence in the record connecting Mason with the commission of the crime, other than the written confession. This court, discussing the facts, pointed out that "it is palpable, from the record, that the defendant is an under-witted boy, and that this so-called confession was extorted from him by an armed bully, sometimes denominated 'a detective' in the employ of the insurance company. We have searched the record in vain to find anything therein directly or indirectly, or by inference, connecting this defendant with the alleged crime."

In the case at bar appellant's confession was not extorted. Moreover, and as hereinbefore pointed out, appellant took the witness stand and testified he killed Gilbertz, relating the circumstances rather fully.

Fourth, that: "The court committed reversible error by its conduct and comments during the examination of Dr. Barton, Dr. Shinnick and Clyde Jolley."

The record discloses no objection was made to the comments complained of by appellant. This court has uniformly held a defendant must object to remarks of a trial court claimed to be improper, and that a failure to do so is a waiver of the alleged error. (*State v. Baker*, 28 Ida. 727, 156 P. 103; *State v. Keyser*, 38 Ida. 57, 59, 60, 219 P. 775; *State v. Frank*, 51 Ida. 21, 27 28, 1 P. (2d) 181; *State v. Smailes*, 51 Ida. 321, 327, 5 P. (2d) 540. See also *Slusser v. Aumock*, 56 Ida. 793, 796, 59 P. (2d) 723; *Towne v. Northwestern Mut. L. Ins. Co.*, 58 Ida. 83, 94, 70 P. (2d) 364.) On this point we direct attention to the following instruction given the jury by the trial court:

"The jury should not consider or in any way or to any extent be influenced or controlled by the remarks or statements of the court in replying to questions or in replying to statements of counsel on either side, or by any remarks

or statements of the court in ruling upon the admissibility of evidence, or to evidence offered but not received, or evidence ordered stricken from the record by the court. Your verdict should be based upon the evidence submitted at the trial and the instructions of the court applicable thereto and upon nothing else."

 Fifth, that: "The addition of the words 'and did he know the difference between right and wrong?' to instruction No. 14, constitutes reversible error."

By instruction No. 14, the trial court instructed the jury:

"Should you be convinced beyond a reasonable doubt that the defendant inflicted the fatal wound, then the court instructs you gentlemen, that the true test and standard of accountability is: Has the defendant sufficient mental capacity to appreciate the character and quality of his acts? Did he know and understand that it was in violation of the rights of another and in itself wrong? Did he know that it was prohibited by the laws of the state and that its commission would entail punishment and penalty upon himself, *and did he know the difference between right and wrong?*

"If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his acts, he is responsible to the law for the acts thus committed and is to be judged accordingly.

"A person in the possession of a sound mind who commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control his will, cannot be shielded from the consequences of his act." (Emphasis ours.)

In *State v. Larkins,* 5 Ida. 200, 47 P. 945, where, as in the instant case, the defense was insanity, it was held:

"In a murder case, where the defense is insanity, the burden of proving such defense is on the defendant, but he is not required to establish his defense beyond a reasonable doubt. In such case the vital question is, Was the defendant, at the time of the homicide, capable of knowing right from wrong?" (Syllabus by the court.)

It will be observed the trial court, in the instant case, followed the test of responsibility fixed by this court in *State v. Larkins, supra.* Moreover, it is at once apparent the effect of the clause objected to by appellant was to clarify the instruction.

472

■ Sixth, that: The trial court committed reversible error in refusing to give the following instruction requested by appellant:

"Insanity is a disease which prevents a person from understanding the nature of the act in question and its possible consequences, or which renders him incapable of resisting the temptation to commit a crime even though he knows that he is doing wrong."

Appellant cites and relies upon *State v. Van Vlack*, 57 Ida. 316, 356, 65 P. (2d) 736. In that case the trial court gave the jury the above quoted instruction, requested by appellant in the case at bar. In addition to giving that instruction (No. 19 in the Van Vlack case), the trial court (in the Van Vlack case) also and by instruction No. 20, instructed the jury:

" 'Should you be convinced beyond a reasonable doubt that the defendant inflicted the fatal wound, then the court instructs you, gentlemen, that the true test and standard of accountability is: Has the defendant sufficient mental capacity to appreciate the character and quality of his acts? Did he know and understand that it was in violation of the rights of another and in itself wrong? Did he know that it was prohibited by the laws of the state and that its commission would entail punishment and penalty upon himself? If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his acts, he is responsible to the law for the acts thus committed and is to be judged accordingly. A person in the possession of a sound mind who commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control his will, cannot be shielded from the consequences of his act.' "

Van Vlack did not contend either instruction constituted reversible error. He contended there was a conflict between instruction No. 19 (the instruction requested by appellant in the instant case) and instruction No. 20 (above quoted).

This court held against the Van Vlack contention, holding:

"There was no conflict because the one states that insanity is a defense, and the next one more than favorably to the defendant lays down the standard of how the jury would determine whether appellant was insane." (Citing cases.)

 Seventh, that: "A person who is actually insane cannot be 'sane in the legal sense of the word.' "

This point is based upon the testimony of state's witness, Dr. Ralph M. Wade. The doctor testified, on cross-examination:

"Q. Now, Doctor, what do you mean by sane in the legal sense of the word?

"A. May I expand that?

* * *

"A. There's always been considerable difficulty in trying to make a legal definition gibe with a medical diagnosis. It is my understanding that it is to determine if he is sane in the legal sense of the term, and not an effort to get any medical diagnosis; so, because I run into that constantly, I make a point to state specifically what I mean.

"Q. I still want to know what you mean by sane in the legal sense of the word. I am quoting your language.

"A. Yes, that he is able to—essentially that he is able to distinguish right from wrong, and that he or that anyone would know an act that they committed to be wrong.

"Q. Is that all?

"A. That is all I can think of at the moment. That is principally it."

It may be conceded, as contended by appellant, a person cannot be "sane in the legal sense of the word," if he is actually so insane by "medical diagnosis" he does not know the difference between right and wrong. But Dr. Wade did not testify appellant was so insane by "medical diagnosis" he did not know the difference between right and wrong. The doctor testified to the contrary, that appellant was "able to distinguish right from wrong." And that is the test of accountability to the law in this jurisdiction.

Weihofen, in his excellent work entitled "Insanity as a Defense in Criminal Law" (pp. 14, 15 and 16), discusses "The Legal Tests of Irresponsibility," from which we quote the following for such light as it casts upon the question of criminal responsibility:

"Of all the problems involved in the subject of mental unsoundness as a defense to crime, the greatest difference of opinion and the most discussion on the part of courts and commentators has centered about the legal 'tests' of insan-

ity—i.e., the degree of mental unsoundness which must be shown to excuse a defendant from criminal responsibility.

"Obviously, not every form of mental unsoundness will render a person irresponsible. It is sometimes stated by text writers and courts, and frequently in statutes, that a person who is 'lunatic' or 'insane' is not capable of committing crime. Such statements and statutes, however, use the terms 'lunatic' and 'insane' in a loose sense, and they must not be understood to mean that every person is held incapable of committing crime who is in any degree mentally diseased or defective. It is only those who are so disordered as to come within the 'test' established by the law in each jurisdiction that are excused from criminal responsibility on the ground of insanity. What the test for irresponsibility should be is a question upon which authorities differ.

"The law in this country (except in New Hampshire) can be summarized as follows:

"A person is not criminally responsible for an offense if at the time it is committed he is so mentally unsound as to lack:

"1. Knowledge that the act is wrong, or

"2. (In seventeen states) Will power enough to resist the impulse to commit it.

"The first part of this rule states the so-called 'right and wrong test.' This part of the rule is law everywhere; and it is the *sole* test of irresponsibility in England and in twenty-nine American states. The wording of the rule varies considerably; in fully half the cases it is stated that to be excused, a defendant must be so disordered as not to know the 'nature and quality' (sometimes 'nature and character,' 'consequences,' etc.) of the act, or if he did know it, that he did not know that is was wrong."

We find no prejudicial error in other rulings complained of.

■■■■■ Here, there is no contention appellant did not shoot and kill the deceased. He testified to that himself. Appellant relies solely on insanity at the time of the homicide. The jury found against him on that defense and fixed his punishment at death. Nevertheless, the record discloses and the state concedes appellant possesses a very low order of intelligence. Undoubtedly, one possessing a normal mind

should be held to a full, strict accountability for his conduct, but, should a person with a pronounced subnormal mind be held to the same high degree of accountability? That, in turn, presents the question as to whether this court may, notwithstanding the verdict of the jury fixing appellant Behler's punishment at death, review the evidence and, if justice be best served, reduce the punishment from death to life imprisonment? That question is answered for us in *State v. Ramirez* (decided in December, 1921), 34 Ida. 623, 203 P. 279, where the identical question presented here was also presented. In the Ramirez case, the opinion being written by Mr. Justice Budge, it was held that:

"This court has power to review any decision of the district courts, and the jury, in a case triable by a jury, is as much a part of the court as the judge. Each has certain legal duties and functions, and the combined action of the jury and the judge makes up and merges in the final judgment. The action of the jury in imposing the death penalty merged in the judgment and became a part of the decision of the court. Const., art. 5, sec. 9, grants to this court power to review such decisions. No limitation of such power is found in the constitution, and if it exists it must be found there. The legislature, being but a co-ordinate branch of the government, is without authority to clothe the jury with the exclusive right to fix the extent of the punishment, this being essentially a judicial act, incorporated in the decision of the court."

Continuing, Justice Budge quoted (*Chambers v. State*, 16 Okl. Cr. 238, 182 P. 714), the following with complete approval:

" 'In a capital case, the law of our state in its great humanity allows the jury (as does the law of the State of Idaho), after they have first determined the question of guilt, to assess the punishment, which may be death or imprisonment for life at their discretion, and even after the jury say that the defendant should suffer death, this court, in furtherance of justice, has the power to modify the judgment to imprisonment for life.' "

And Justice Budge further held in the Ramirez case: "Considerations of both reason and justice uphold the proposition that this court may modify a judgment where the jury has found the defendant guilty of murder in the first

degree and fixed the punishment at death, when the furtherance of justice requires such modification."

After a careful study and review of all the evidence, facts and circumstances in the case at bar, we have finally concluded that, in furtherance of justice, the judgment appealed from should be modified so as to reduce it from capital punishment to life imprisonment. (In addition to *State v. Ramirez,* supra, see *State v. Sprouse,* 63 Ida. 166, 170, 118 P. (2d) 378.) Therefore, the judgment appealed from is so hereby modified and the cause hereby remanded to the trial court with direction to fix the punishment therefor accordingly.

Ailshie and Dunlap, JJ., concur.

BUDGE, J., dissenting—I concur in the conclusion reached in the majority opinion with the exception of that portion reducing the sentence imposed upon appellant from death to life imprisonment.

The homicide committed by appellant was, as charged in the information, i.e., substantially, that appellant wilfully, deliberately, premeditatedly killed the deceased John P. Gilbertz, at the time, in the manner and by the means alleged in the information; that the homicide so committed was murder in the first degree. The jury, by virtue of sec. 17-1104, I.C.A., fixed the penalty at death. To avoid the infliction of the penalty and to clear himself of the crime so committed, appellant interposed the defense of insanity. Prior to his trial, a jury was impanelled composed of 12 jurors duly selected to determine the sanity or insanity of appellant at the time of the trial, and found unanimously by their verdict that appellant was sane. When placed upon his trial, appellant again interposed the defense of insanity. The question of his sanity or insanity was again submitted to 12 jurors selected from the body of the county where the crime was committed and after hearing the testimony pro and con as to appellant's sanity or insanity, found by its unanimous verdict that appellant was sane when he committed the murder and at the time of the trial. 24 jurors having found appellant sane is sufficient to satisfy my mind that the verdict of the jury should be upheld and the judgment enforced. The task of the appellate court is complete when it has determined whether or not appellant had a trial in conformity with the forms of law and when

that question is determined the authority of the appellate court ceases. The question of appellant's sanity or insanity was a question of fact and the evidence overwhelmingly supports the jury's verdict.

Conceding, but not deciding, that appellant was of low mentality that is no defense that would justify the reduction of the penalty where it was established beyond controversy that he knew the difference between right and wrong. In the interest of brevity, attention is called to the following cases:

"In view of the youth of the defendant, his lack of mental development, and his almost uniformly good conduct before the crime was committed, we should have been better satisfied had the jury designated imprisonment in the penitentiary for life as his punishment; but, in a legal sense, the evidence was sufficient to authorize the punishment designated, and there is no sufficient ground upon which we can prevent it. We find no error in the record prejudicial to defendant, and the judgment of the district court is affirmed." (*State v. Dooley,* 89 Iowa 584, 57 N.W. 414, 417.

"There is not room for the slightest doubt concerning the mental competency of the defendant. It was not until after he had committed this dreadful crime that anyone thought to question his mentality. * * * * He knew perfectly well what he was doing at the time of the crime, the details of which he had carefully arranged, and he understood the nature and consequences of his act. * * * He deliberately committed murder with the intent to perpetrate a robbery. It was not an abuse of discretion to impose the death penalty." (*Commonwealth v. Hipple,* 333 Pa. 33, 3 A. (2d) 353.

"*\* \* \* \* where evidence showed that defendant was able to distinguish between right and wrong but was suffering from high grade feeble-mindedness, question for Supreme Court's consideration was not whether Supreme Court would have imposed death penalty, but whether discretion vested in trial court was judicially exercised and whether record showed a case in the class justifying sentence of death or in the class justifying sentence of life imprisonment.*" (Syllabus; (Italics ours.) (*Commonwealth v. Howell,* 338 Pa. 577, 13 A. (2d) 521.)

In *Commonwealth v. Hawk,* 328 Pa. 417, 196 A. 5, a case in many respects similar to the case at bar the following language is found:

"* * based on its conclusion that defendant's aberration from normal was slight, the court below refused to impose less than the extreme penalty which the crime itself made appropriate.

"This record shows that defendant knew exactly what he was doing, before, during, and after the crime; that he understood the nature and consequences of his act; that he wilfully and deliberately murdered two, and attempted to destroy three unsuspecting women; that with much cunning during the perpetration of the crime, and afterward, he attempted to hide his guilt. The facts show conclusively that even though emotionally defective the variation was so negligible that he was as responsible for his acts as a normal person. * * * The discretion vested * * * in the sentencing judge was wisely and judicially exercised."

Cases may be found that upon their face appear to be in conflict with the above cases, but a close study of the facts in each particular case discloses that they are in harmony on two basic principles: (1) Evidence of mental derangement although not amounting to legal insanity is admissible for purpose of mitigation of sentence. (2) Even though accused is afflicted with a mental derangement such as low mentality unless the jury abused the discretion vested in it, (to either impose life imprisonment or the death penalty) its verdict should not be disturbed by a reviewing court. In *State v. Ramirez*, 34 Ida. 623, 638, 203 P. 279, this court said: "it is clear to our minds that the jury abused its discretion" in assessing the extreme penalty of death, and the judgment was therefore modified to life imprisonment at hard labor.

There are no mitigating circumstances disclosed by the record. The sole ground for reducing the penalty is predicated upon the theory that appellant is of low mentality. Applying the two principles above set out, evidence of appellant's low mentality was properly admitted; but I am unable to say that the discretion of the jury was not judicially exercised, or that the jury abused its discretion in imposing the death penalty rather than life imprisonment. All the elements of first degree murder are present and there is substantial evidence to support the sentence of death.

The judgment should be affirmed.

Givens, J., concurs.