456 P.2d 797

**STATE of Idaho, Plaintiff-Appellant,**

v.

**Janet WHITE, Defendant-Respondent.**

**No. 10254.**

Supreme Court of Idaho.

June 30, 1969.

**154**

Allan G. Shepard, Atty. Gen., Mack A. Redford, Deputy Atty. Gen., Boise, for appellant.

Thomas A. Mitchell, Coeur d'Alene, for appellee.

McQUADE, Justice.

On the afternoon of Feburary 18, 1967, Janet White, defendant below, was changing her second child, a three month old infant. As she afterwards told the doctor at the hospital emergency room where the baby was taken, the baby was screaming, "my mind snapped, and I threw her on the floor." Mrs. White then picked the baby up and put it in the crib. An hour later, the baby died from what was later determined to be a large skull fracture on the left side of the head, causing massive blood clot pressure on the brain and the cessation of the life functions. Janet White was charged with and acquitted of the criminal offense of voluntary manslaughter on the defense of insanity. It is from the judgment of acquittal that the State takes this appeal.

The main issue at trial was Mrs. White's sanity at the time of the incident. This issue was explored through the testimony of three doctors: Conlyn Cedarblom, a general practitioner and Mrs. White's obstetrician for her two deliveries; Sol Levy, a specialist in psychiatry and neurology called by the prosecution; and Myrick Pullen, a specialist in psychiatry and Director of Mental Health Division of the Idaho State Department of Health called by the defense. There was little disagreement among these witnesses, though the disagreement which developed was critical and will be detailed after an exposition of the uncontroverted facts.

At the time she killed her second child, Mrs. White was about 19 years old. Her parents were divorced when she was four years old, and she was shifted from one parent to the other. There was heavy drinking in that family, and afterwards her father remarried. Her father and half brother made attempts to seduce her, and her stepmother was hostile to her. She quit school after the tenth grade and married her husband, who is now twenty-two and a logger. They lived in an apparently isolated house trailer. Her second child was born eleven months after the first child, and this aggravated existing post-partum depression. Mrs. White has about average intelligence and has no physical defects.

As to the specific incident, Dr. Cedarblom testified that, at the hospital after the child's death, Mrs. White was very withdrawn, showed no remorse and was abnormally composed. Dr. Levy examined Mrs. White by means of an interview on February 21, 1967, for about one and one-half hours. He stated that she was suffering from general exhaustion and had lacked social and recreational outlets. He stated that she had long suffered from rather severe depression. For this reason she was committed to State Hospital North after a second examination by Dr. Levy on March 2, 1967. Dr. Pullen agreed with Dr. Levy's testimony up to his analysis of the incident and its aftermath.

The disagreement between Drs. Levy and Pullen was as follows. Dr. Levy gave his opinion that Mrs. White's depression after the incident was normal shock reaction and that she did feel remorse at the first interview. Dr. Levy concluded that Mrs. White was not schizophrenic because he found she had good environmental contact and no fancy or daydreaming. He stated that the "snapping" of her mind was a rationalization for the act and doubted whether she went into a psychotic depressive reaction at the time of the incident be-

cause it would have had a longer duration. Thus, Dr. Levy testified that at the time of the incident she was capable of distinguishing between right and wrong. However, and very significantly, Dr. Levy admitted on cross-examination that her act of throwing the child on the floor (and other previous acts of spanking the same 2–3 month old infant) were symptoms of emotional illness, and that she was not capable of conforming her conduct to the requirements of the law as a result of this illness.

Dr. Pullen, as director of State Hospital North at that time, treated Mrs. White from March 5, 1967, until September of 1967, when he left for a new post. He conducted five to six interviews and gave various tests. The Wexler-Bellevue intelligence test showed poor ability to engage in abstraction or generalization. The Rorschach test showed "contamination" (defined as the addition of unrealistic elements to otherwise realistic responses to Rorschach stimuli) and "confabulation" (defined as unrecognized replacement of lost memory by fantasy). This test was said to be quite reliable, especially for these two symptoms. Thus, Dr. Pullen reached the conclusion that Mrs. White was suffering from "acute schizophrenic reaction, undifferentiated type of episodic nature." Dr. Pullen gave his opinion that the incident represented a break with reality in response to mental illness, that Mrs. White at the time of the incident had *neither* the capacity to distinguish right from wrong *nor* the capacity to conform her conduct to the requirements of the law. Dr. Pullen testified that some remorse is not inconsistent with episodic schizophrenia, that he believed he had an observational advantage over Dr. Levy, that Mrs. White's condition could have become worse after the incident but probably remained the same as it had been, and that mental illness of this type can long exist, surface suddenly, and fade away.

Under the instructions given by District Judge Prather, the jury found Mrs. White not guilty by reason of insanity. The State has appealed by authority of I.C.

§§ 19–2804(5) and 19–2808 "for the future guidance of courts only" as to the proper instructions on the insanity defense in Idaho.

The instructions given by the court below relative to the defense of insanity were as follows:

## "INSTRUCTION NO. 9

"Insanity as used in these instructions means a mental disease or defect which causes lack of substantial capacity either to appreciate the wrongfulness of one's conduct or to conform one's conduct to the requirements of law."

## "INSTRUCTION NO. 10

"The defendant has interposed insanity as a defense. The law presumes that a defendant is sane. This presumption is rebuttable. Where evidence has been introduced that a defendant suffered a mental disease or defect at the time of the commission of the crime charged, the State must prove beyond a reasonable doubt that the defendant did not have a mental disease or defect or that, despite some mental disease or defect, she had substantial capacity both to appreciate the wrongfulness of her conduct and to conform her conduct to the requirements of the law."

## "INSTRUCTION NO. 11

"The law presumes that all men are sane and responsible for their acts. In this case, the defendant has interposed the defense of insanity. The law does not place upon her the burden of proving beyond a reasonable doubt that she was insane at the time the act charged was committed, but only places the burden upon her to raise in your minds a reasonable doubt as to the sanity of the defendant at the time of the commission of the act alleged in the information. If you have such doubt, then this reasonable doubt must be resolved in her favor and you must acquit her of the crime charged."

"INSTRUCTION NO. 12

"Your are instructed that should you first find the defendant wrongfully killed her child, then the Court instructs you, that the true test and standard of acountability is:

Had the defendant sufficient mental capacity to appreciate the character and quality of her acts?

Did she know and understand that it was in violation of the rights of another and in itself wrong?

Did she know that it was prohibited by the laws of the State and that its commission would entail punishment and penalty upon herself?

Did the defendant have sufficient mental capacity to conform her conduct to the requirements of the law?

"If she had the capacity thus to appreciate the character and comprehend the possible or probable consequences of her acts and to so conform her conduct, she is responsible to the law for the acts thus committed and is to be adjudged accordingly. A person in the possession of substantial mental capacity to know and understand the nature and quality of their acts and to control their conduct who commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control their will, cannot be shielded from the consequences of her act."

These instructions essentially embody the test of criminal responsibility set forth in American Law Institute's Model Penal Code (1962):[1]

"Section 4.01. Mental Disease or Defect Excluding Responsibility.

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct [or to conform his conduct] to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

This Court had generally adhered to the M'Naghten rule:

"That to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."[2]

This latter rule, usually described as a test of whether an accused had the capacity to distinguish right from wrong at the time of the act, has been followed with only slight variations.[3] Referring to these cases, the State asks that the M'Naghten rule be reaffirmed. Counsel for respondent White contends, however, that the M'Naghten rule has serious deficiencies and that a more enlightened test should be adopted.

1. The district court's instructions were based upon State v. Behler, 65 Idaho 464, 146 P.2d 338 (1944), State v. Van Vlack, 57 Idaho 316, 65 P.2d 736 (1937), and State v. Iverson, 77 Idaho 103, 289 P.2d 603 (1955), as modified to conform to the American Law Institute provision; cf. Manual On Jury Instructions In Federal Criminal Cases § 5.03 (1965).

2. M'Naghten's Case, 10 Cl. & Fin. 200, 210, 8 Eng.Rep. (Full Reprint) 718, 722 (H.L. 1843).

3. State v. Gish, 87 Idaho 341, 393 P.2d 342 (1964); State v. Iverson, 77 Idaho 103, 289 P.2d 603 (1955); State v. Powell, 71 Idaho 131, 227 P.2d 582 (1951); State v. Behler, 65 Idaho 464, 146 P.2d 338 (1944); State v. Van Vlack, 57 Idaho 316, 65 P.2d 736 (1937); State v. Tharp, 48 Idaho 636, 284 P. 201 (1930); State v. Fleming, 17 Idaho 471, 106 P. 305 (1910); State v. Shuff, 9 Idaho 115, 72 P. 664 (1903); State v. Larkins, 5 Idaho 200, 47 P. 945 (1897).

In recent years, the federal circuit courts of appeal are almost unanimously committed to, or have approved the use of, the test of criminal responsibility adopted by the American Law Institute.[4] Among the exceptions, the first and ninth circuits do not appear to have recently considered the question, while the District of Columbia circuit has long applied its own rule "that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."[5]

These courts, in the absence of controlling precedent by the Supreme Court,[6] have explored several considerations which were found persuasive in the abandonment of M'Naghten in favor of a more enlightened rule. First, the M'Naghten rule, sanctioned in 1843, embodies conclusions about human psychology which derive from times much earlier than the date of decision of the case. Thus, in the Eirenarcha [Handbook for Justices of the Peace] of 1582, William Lambard of Lincoln's Inn set forth the test of whether the man had a "knowledge of good or evil." Arnold's Case, 16 State Trials 695 (1724), set forth the so-called "Wild Beast" test of whether the defendant "doth not know what he is doing no more than * * * a wild beast." The M'Naghten test involves only slight changes in wording, that is, knowing the difference between right and wrong. It is quite unrealistic to continue in the twentieth century to be bound by relatively primitive legalistic concepts, even through psychiatry is still unable to answer many questions about the human mind. This was the point argued by Justices Cardozo and Frankfurter.[7]

Second, the origins of M'Naghten itself are rather dubious in that, as judicial precedent, it appears to have been a product more of political necessity than of judicial reason. In Hadfield's Case, 27 State Trials 1281 (1800), the defendant had been acquitted of the charge of attempting to kill King George III under an instruction to the jury asking whether he was "under the influence of insanity at the time the act was committed" and not under the "guidance of reason." This test somewhat resembles the Durham test above. Daniel M'Naghten himself was acquitted of the charge against him by reason of insanity. The English court considered the enlightened views of Dr. Isaac Ray as to mental illness. After the decision, however, Queen Victoria in effect demanded reconsideration by the House of Lords for future cases, and the right-wrong test was reaffirmed in an advisory opinion despite its ancient origins.[8]

Third, the M'Naghten formulation is deficient in several respects. The test very narrowly asks only whether the defendant was capable of *recognizing* the difference between right and wrong and thus, considers only *cognitive* aspects of personality. The test omits the *volitional* aspect, that is, whether the person is able to decide to do or not to do something and has the capacity to conform to that decision by controlling conduct accordingly. Thus, under M'Nagh-

4. United States v. Freeman, 357 F.2d 606 (2nd Cir. 1966) (per Kaufman, J.); United States v. Currens, 290 F.2d 751 (3rd Cir. 1961) (per Biggs, J.); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968); Blake v. United States, 407 F.2d 908 (5th Cir. 1969); United States v. Smith, 404 F.2d 720 (6th Cir. 1968); United States v. Shapiro, 383 F.2d 680, (7th Cir. 1967); Pope v. United States, 372 F.2d 710 (8th Cir. 1967); Wion v. United States, 325 F.2d 420 (10th Cir. 1963) (per Murrah, J.).

5. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954), as modified by McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962).

6. Davis v. United States (I), 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), and Davis v. United States (II), 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897), in each instance have been found not controlling.

7. Cardozo, What Medicine Can Do For Law (1930); Testimony of Frankfurter, Report of the Royal Commission on Capital Punishment 102 (1953).

8. See generally, Weihofen, Insanity as a Defense in Criminal Law 17–32 (1933).

ten, persons who know the difference between right and wrong but who are incapable of controlling their conduct to conform to what is right because of functional or organic mental illness will be convicted as criminals. Nor does the M'Naghten test recognize any degrees of mental illness, since the jury is asked simply to find whether the defendant knew right from wrong. This in turn artificially constricts psychiatric testimony and deprives juries of information very relevant to their legal judgment.

Fourth, the conviction of mentally ill persons under the M'Naghten rule does not serve the purpose of punishment in the criminal law, and it certainly does not serve the end of rehabilitation but rather may serve to release a mentally ill person to society after futile confinement.

Most American states at first adopted the English jurisprudence of M'Naghten. New Hampshire, however, early adopted the "product" test.[9] The rigid quality of M'Naghten has often been alleviated by the addition of some form or "irresistible impulse" or "diminished responsibility" test.[10] In this form, several states have recently reaffirmed their adherence to M'Naghten.[11] However, Iowa did so only very hestitantly and over two dissents.[12] The Wisconsin court approves the American Law Institute (A.L.I.) test if the defendant assumes the burden of proof on the insanity issue.[13] A majority of the Arizona court find the

A.L.I. test to be "a desirable approach" but feel a change can be made only legislatively.[14] The Minnesota court disapproves M'Naghten in dicta.[15] Massachusetts accepts the A.L.I. test as an evolutionary form of its existing role.[16]

Moreover, several states have recently enacted legislation modifing or abolishing the M'Naghten rule. New York has expanded M'Naghten's terms consistent with the first part of the A.L.I. test but has omited its "capacity to conform" clause.[17] Illinois has adopted the A.L.I. test verbatim.[18] Vermont also has adopted the A.L.I. test verbatim and abolished M'Naghten,[19] while Maine has adopted the Durham "product" test.[20] Some form of change has been avocated for Idaho.[21]

■ On the basis of the considerations mentioned above and what we find to be a significant trend of persuasive authority, we conclude that the courts of this State should no longer adhere to the M'Naghten rule on criminal responsibility. Instead, we adopt the test of criminal responsibility set forth in 1962 by the American Law Institute. We therefore essentially approve the instructions given by the district court in this case. We are mindful that the terms and scope of an insanity defense to criminal responsibility is essentially a legal policy question which cannot be assigned to medical authorities for an answer. We recognize that the answers which the law provides to this question cannot always be

9. State v. Pike, 49 N.H. 399 (1869).

10. See Weihofen, *op. cit.* n. 7, *supra*, 44–64.

11. People v. Wolff, 61 Cal.2d 795, 40 Cal. Rptr. 271, 394 P.2d 959 (1964); State v. Noble, 142 Mont. 284, 384 P.2d 504 (1963); Dare v. State, 378 P.2d 339 (Okl.1963); State v. Poulson, 14 Utah 2d 213, 381 P.2d 93 (1963); State v. White, 60 Wash.2d 551, 374 P.2d 942 (1962); Chase v. State, 369 P.2d 997 (Alaska 1962); State v. Lucas, 30 N.J. 37, 152 A.2d 50 (1959).

12. State v. Harkness, 160 N.W.2d 324 (Iowa 1968).

13. State v. Shoffner, 31 Wis.2d 412, 143 N.W.2d 458 (1966).

14. State v. Schantz, 98 Ariz. 200, 403 P. 2d 521 (1965).

15. State v. Dhaemers, 276 Minn. 332, 150 N.W.2d 61 (1967).

16. Commonwealth v. McHoul, 352 Mass. 544, 226 N.E.2d 556 (1967).

17. N.Y. Penal Law, McKinney's Consol. Laws, c. 40, § 30.05 (McKinney 1967).

18. Ill.Rev.Ann.Stat. ch. 38, § 6–2 (Smith-Hurd 1965).

19. Vt.Stat.Ann., title 13, §§ 4801–4802 (1959).

20. 15 M.R.S.A. § 102 (1961).

21. See Comment, Insanity as a Defense in Idaho, 3 Idaho L.Rev. 132 (1966).

fully consistent with psychiatric knowledge, which is so subject to change and conflict. The M'Naghten rule needs repair rather than utter rejection.[22]

It is for these latter reasons that we adopt the A.L.I. test in preference to other alternatives such as the Durham rule, irresistible impulse, or diminished responsibility. The Durham rule, which inquires only whether the criminal act was a product of mental disease or defect, has been thought to be too indeterminate. Experience under the Durham rule has indicated that its application tends to cause the law to abdicate its policy functions in deference to purely medical considerations. On the other hand, irresistible impulse as a basis for negativing criminal responsibility is semantically unsatisfactory and possibly subject to abuse. It represents a somewhat haphazard modification of M'Naghten. The theory of diminished responsibility is unsatisfactory for our purposes both because it is overbroad and because the consequences of its application are different. It is overbroad because it includes not only mental diseases or defects but any state which prevents the formation of *mens rea*, e.g., intoxication.[23] Its consequence is not to exclude criminal responsibility, as would the application of the A.L.I. test, but simply to reduce the level of criminal responsibility.

Most courts which have considered the A.L.I. test have concluded that it is an expanded version of M'Naghten which attempts to avoid certain problems inherent in Durham. The first branch of the A.L.I. test provides that a person is not criminally responsible if " * * * as a result of mental disease or defect he lacks substantial capacity * * * to appreciate the criminality [wrongfulness] of his conduct. * * *" "Appreciate" is substituted for M'Naghten's "know" in order to allow consideration of emotional as well as intellectual knowledge. "Criminality [wrongfulness] of his conduct" is substituted for M'Naghten's "nature and quality of the act he was doing." This change clarifies what was probably intended by the House of Lords in the first place and prevents a narrow reading of the latter terms which would excuse a defendant only if he was totally unaware of *what* he was doing as in the case of idiots or complete paranoids or psychotics. "As a result of" mental disease or defect is substituted for Durham's "product" in an attempt to eliminate what has been a bothersome word. "Lacks substantial capacity * * * to appreciate * * *" is substituted for M'Naghten's "not know" in an effort to make the question more realistically a matter of degree rather than one of black and white. This much of the A.L.I. test is really only a summary of the whole of M'Naghten in more comprehensive terms.

The major departure from M'Naghten is in the A.L.I.'s addition of the clause which excludes responsibility if, as a result of mental disease or defect, the person lacks substantial capacity "to conform his conduct to the requirements of law." This branch of the A.L.I. test requires consideration of volitional impairments as well as cognitive impairments. Thus, a person who appreciates the wrongfulness of his act is still not responsible if he cannot conform to the requirements of law. The *limiting principles* here are *first* that the lack of capacity to conform must derive from mental disease or defect, i.e., causes over which the person has no control and which just happen unfortunately to certain individuals, and not

22. See, e. g., Cooper, Toward a Rational Doctrine of Criminal Responsibility, 59 J.Crim.L., Criminology & Pol.Sci. 338 (1968) ; Dershowitz, Psychiatry in the Legal Process: "A Knife That Cuts Both Ways," 51 Judicature 370 (1968) ; Fingarette, The Concept of Mental Disease in Criminal Law Insanity Tests, 33 U.Chi.L.Rev. 229 (1966) ; Diamond, From *M'Naghten* to *Currens*, and Beyond, 50 Cal.L.Rev. 189 (1962); Hall, The M'Naghten Rule and Proposed Alternatives, 49 A.B.A.J. 960 (1963) ; Morris, Criminal Insanity, 43 Wash.L.Rev. 583 (1968).

23. See, e. g., People v. Conley, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911 (1966).

from involuntary impairments or other non-disease and non-defect sources. "Mental disease or defect" is not medically defined, and wisely so, for the medical spectrum of diseases is very wide indeed, and the policy of the law will be to recognize only certain of them as negating criminal responsibility. Which ones will be recognized will vary from case to case under the *second limiting principle* built into the A.L.I. conformity clause, namely, that the mental disease or defect must cause a lack of *"substantial"* capacity to conform to the requirements of law. Not all mental diseases or defects will negate criminal responsibility, and a legal rather than medical standard is properly applied to determine the policy line to be drawn.

In summary, the measured words of the A.L.I. test appear to answer certain of the criticisms of the narrowness of M'Naghten and the rather indeterminate scope of other alternatives. Of course, we fail to see any particular merit in the assertion that M'Naghten, as a creation of the judiciary in an advisory opinion in 1843, cannot now be judicially modified. Thus, once a defendant's sanity is put in issue, the State must prove beyond a reasonable doubt either (1) that the defendant had no mental disease or defect at the time of the act, or (2) that, if such disease or defect existed, it did not cause a lack of substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

The instructions given below are approved.

McFADDEN, C. J., DONALDSON, and SPEAR, JJ., and FELTON, D. J., concur.