No. 84–6780. SMITH *v.* FRANCIS, WARDEN. Sup. Ct. Ga. Certiorari denied.

JUSTICE BRENNAN, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976), I would grant certiorari and vacate the death sentence in this case.

JUSTICE MARSHALL, dissenting.

I would vacate the judgment of the Georgia Supreme Court insofar as it left undisturbed the death sentence imposed in this case. *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting). The petitioner has presented an important question concerning the Eighth Amendment's ban on cruel and unusual punishment as applied to the execution of a mentally retarded person.

I

The petitioner is mentally retarded, with an IQ of 65 and mental abilities roughly equivalent to those of a 10-year-old child. He was tried for the murder of one Dan Turner, a friend of the petitioner and his family. There were no eyewitnesses to the crime. The petitioner had gone into Turner's grocery store to buy some cigarettes. The petitioner testified at trial that he grabbed Turner when the latter opened the cash register. Turner reacted by picking up a hammer, and the petitioner then stabbed him and hit him with the hammer after it fell from the victim's hand. The petitioner took money from the cash register and Turner's wallet and fled.

The petitioner turned himself in to the police and gave a lengthy statement in which he admitted stabbing Turner. When asked about the reasons for his actions, the petitioner stated that he had wanted to get money. At trial, however, the petitioner stated that he had not entered the store intending to rob Turner, and did not know why he had grabbed Turner as the latter was getting the petitioner's cigarettes.

A psychiatrist who examined the petitioner stated that the petitioner showed considerable remorse in discussing the murder. The petitioner testified at trial that he "didn't mean to kill Mr. Dan," but had gotten "carried away" after he saw the victim wielding the hammer in what the petitioner interpreted as a threatening manner. There was evidence that the petitioner was under considerable stress in the days preceding the murder. The petitioner's counsel argued that the petitioner was insane or, at minimum, lacked the requisite mental intent because of his retardation. Nevertheless, the jury found the petitioner guilty of malice murder and armed robbery and sentenced him to death.

## II

In *Furman* v. *Georgia*, 408 U. S. 238, 363–369 (1972) (MAR-SHALL, J., concurring), I concluded that the death penalty was "morally reprehensible" to contemporary society based, in part, on its discriminatory imposition. Statistically, it was "evident that the burden of capital punishment falls upon the poor, the ignorant, and the underprivileged members of society." *Id.*, at 365–366 (footnote omitted). The petitioner suffers the unfortunate distinction of meeting each of these criteria. His case, like so many others coming before this Court, convinces me of the continuing validity of my observations in *Furman*.

I need not recount here our country's shameful history with respect to the mentally retarded. See *Cleburne* v. *Cleburne Living Center*, 473 U. S. 432, 455 (1985) (MARSHALL, J., concurring in judgment in part and dissenting in part). I believe, however, that the courts bear a special responsibility when faced with the possible execution of a member of a group that has been subject for so long to irrational social stigma.[1] This is particularly true in the instant case, because the petitioner's handicap necessarily diminishes his culpability. A mentally retarded person who is susceptible to confusion and impulsive reaction when put in a stressful situation[2] is the very opposite of the cold-blooded, calculating killers that populate this Court's opinions validating the death penalty. See, *e. g.*, *Gregg* v. *Georgia*, *supra*, at 185–186 (opinion of Stewart, POWELL, and STEVENS, JJ.).

---

[1] It cannot be denied that American communities have traditionally shown a strong desire to be rid of the mentally retarded in any way possible. See *Cleburne*, 473 U. S., at 462 (retarded subjected during end of 19th and beginning of 20th centuries to a "regime of state-mandated segregation and degradation . . . that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow"). See also *Buck* v. *Bell*, 274 U. S. 200, 207 (1927) (upholding compulsory sterilization as alternative to "waiting to execute degenerate offspring for crime"); *Halderman* v. *Pennhurst State School & Hospital*, 446 F. Supp. 1295, 1299–1300 (ED Pa. 1977) (noting history of institutionalization of mentally retarded), aff'd in part and rev'd in part, 612 F. 2d 84 (CA3 1979), rev'd, 451 U. S. 1 (1981).

[2] A psychiatrist who examined the petitioner testified that he exhibits these characteristics. See Affidavit of Dr. Fisher, App. H to Pet. for Cert. The characteristics are typically found in the mentally retarded. See M. Sternlicht & M. Deutsch, Personality Development and Social Behavior in the Mentally Retarded 81–82 (1972).

This Court has demanded that a capital sentencing scheme provide, at a minimum, a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not," *Furman, supra,* at 313 (WHITE, J., concurring); see *Godfrey* v. *Georgia,* 446 U. S. 420, 427–428 (1980) (plurality opinion). In this case, the mechanical application of the Georgia sentencing scheme undermined one purpose that the Court has determined to underlie such procedures—to reserve the penalty of death for the most culpable killers, thus satisfying society's "'instinct for retribution,'" *Gregg* v. *Georgia, supra,* at 183 (quoting *Furman, supra,* at 308 (Stewart, J., concurring)).[3] The execution of a

---

[3] Courts have often shown reluctance to impute to a retarded defendant the necessary culpability to uphold a sentence of death. See, *e. g., State* v. *Hall,* 176 Neb. 295, 309–310, 125 N. W. 2d 918, 926–927 (1964) (exercising its statutory prerogative to "'reduce the sentence rendered . . . when in its opinion the sentence is excessive,'" court concluded that where the defendant, had an IQ of 64, "reduction of the death penalty to one of life imprisonment is warranted"); *State* v. *Behler,* 65 Idaho 464, 474–475, 146 P. 2d 338, 343 (1944) ("Undoubtedly, one possessing a normal mind should be held to a full, strict accountability for his conduct, but, should a person with a pronounced subnormal mind be held to the same high degree of accountability?"); *Commonwealth* v. *Green,* 396 Pa. 137, 151 A. 2d 241 (1959) (vacating death sentence where sentencer had failed to consider mitigating factors, including defendant's youth and subnormal intelligence). See also *Thompson* v. *State,* 456 So. 2d 444, 448 (Fla. 1984) (trial judge erred in overriding jury recommendation of life imprisonment on the grounds that no mitigating circumstances existed, where "appellant's mental retardation could have been considered by the jury as a basis for recommending life imprisonment"). Legislatures have also acknowledged that the retarded are less deserving of the death penalty than other offenders. Many state statutes make mental disease or defect at the time of the criminal act a mitigating factor. See Ark. Stat. Ann. § 41–1304(3) (1977); Cal. Penal Code Ann. § 190.3(h) (West Supp. 1985); Conn. Gen. Stat. § 53a–46a(f)(2) (1985); Ind. Code § 35–50–2–9(c)(6) (1985); Ky. Rev. Stat. § 532.025(2)(b)(7) (1985); La. Code Crim. Proc. Ann., Art. 905.5(e) (West 1984); Md. Ann. Code, Art. 27, § 413(g)(4) (Supp. 1985); Neb. Rev. Stat. § 29–2523(2)(g) (1979); N. J. Stat. Ann. § 2C:11–3(c)(5)(d) (West 1982); Ohio Rev. Code Ann. § 2929.04(B)(3) (1982); Tenn. Code Ann. § 39–2–203(j)(8) (1982); Wash. Rev. Code § 10.95.070(6) (1983). See also Ala. Code § 13A–5–51(6) (1982); Ariz. Rev. Stat. Ann. § 13–703(G)(1) (Supp. 1984–1985); Fla. Stat. § 921.141(6)(f) (1983); Miss. Code Ann. § 99–19–101(6)(f) (Supp. 1985); Mo. Rev. Stat. § 565.032(3)(6) (Supp. 1984); Mont. Code Ann. § 46–18–304(4) (1983); N. H. Rev. Stat. Ann. § 630:5(II)(b)(4) (1983); N. M. Stat. Ann. § 31–20A–6(C) (1981); N. C. Gen. Stat. § 15A–2000(f)(6) (1983); 42 Pa. Cons. Stat. § 9711(e)(3) (1982); S. C. Code § 16–3–20(C)(b)(6) (1985); Va. Code § 19.2–264.4(B)(iv) (1983); Wyo. Stat. § 6–2–102(j)(vi) (1983).

mentally retarded person serves this retributive function extremely poorly, because the level of "personal responsibility and moral guilt," *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982), is so much lower than in the case of a fully competent person who commits the same crime.[4] As applied to the petitioner, the death penalty is "nothing more than the purposeless and needless imposition of pain and suffering," *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion), and therefore unconstitutional.

---

[4] Recognizing the greatly lower culpability of the mentally defective is certainly not novel; Blackstone notes that "by the law . . . ever since the time of Edward the Third, the capacity of doing ill, or contracting guilt, is not so much measured by years and days, as by the strength of the delinquent's understanding and judgment." 4 W. Blackstone, Commentaries *23.